Opinion
 

 LILLIE, P. J.
 

 Andrew D. Weaver, who sustained serious injuries as a passenger in a car pursued by police officers, appeals from summary judgment granted in favor of defendants on his complaint for state law claims of assault, battery, and negligence, and for deprivation of civil rights under color of state law, in violation of 42 United States Code section 1983 (section 1983). Weaver contends that the court erred in concluding his state law claims were barred by statutory immunities from liability and in concluding that his federal cause of action against the individual officer defendants was without merit on the grounds that it was undisputed that the seizure was reasonable under the Fourth Amendment and that defendants were immune from liability under the “qualified immunity doctrine.”
 

 
 *193
 
 Factual and Procedural Background
 

 A.
 
 Facts.
 

 For the underlying facts of this incident to support and oppose the summary judgment motion below, the parties relied upon the depositions of defendants and California Highway Patrol (CHP) Officers Flores and Johnson and the deposition of Jesse Keith. Unless otherwise specified, the following facts are gleaned from the foregoing depositions.
 

 On June 13, 1994, 14-year-old Jesse Keith, who lived in the town of Adelanto, offered to wash a neighbor’s Nissan Altima automobile; the neighbor gave him the keys to the car to move it to his, Keith’s, driveway, for the process of washing it; after he had washed the car, Keith decided to take the car after he had received four or five telephone calls from the 13-year-old plaintiff, his neighbor, urging him to take the car joyriding; Keith picked up the 13-year-old plaintiff, and some other juvenile friends, and drove the car throughout the area that afternoon and evening; early in the morning of June 14, Keith and plaintiff took off the front license plate from another similar type of car and put it on the rear of the Altima; around 2 p.m. on June 14, when plaintiff was the only passenger in the car with Keith, the Adelanto police tried to stop Keith, but he got on the freeway; the pursuit of the Altima was then continued by the Rancho Cucamonga unit of the CHP.
 

 After the pursuit had lasted over an hour and had covered several freeways, Officer Flores heard a radio dispatch about a stolen vehicle on the San Bernardino Freeway; about this time, his supervisor, Sergeant Johnson, heard the radio broadcast and both joined the pursuit in separate patrol cars on the freeway. Johnson directed Flores to take over the pursuit in the primary position, directly behind the stolen car; Johnson took up the position behind Flores as the secondary unit; Johnson gave Flores instructions and orders on what to do during the pursuit. Both Johnson and Flores worked out of the Baldwin Park unit of the CHP. According to written records of the radio dispatches over CHP frequencies, by 3:40 p.m., the Baldwin Park unit of the CHP had taken over the pursuit and the other CF1P units backed out of the pursuit. About this time, the dispatch log also indicated that the Los Angeles County Sheriff’s helicopter was overhead and had the Altima in view.
 

 With Flores and Johnson in pursuit, Keith went north on the 605 Freeway and then east on the 210 Freeway; traffic on the freeways was moderate to light. Although Johnson characterized Keith’s driving on the freeway as
 
 *194
 
 “reckless,” as he had driven in the median at one time, Johnson admitted that no other cars had to take any evasive action as Keith drove around them. Keith then got off the 210 Freeway in Duarte and circled around surface streets in residential areas at speeds of between 15 to 20 and 50 to 70 miles per hour;.in one residential area, Keith circled the same block so many times that residents began to come out of their houses and a crowd formed in the streets; two other police cars were behind Johnson for the pursuit on surface streets. Keith went through red lights and stop signs. At one point, Keith turned into a residential driveway and stopped; Flores partially blocked the Altima, but fearing the driver would back up into him, moved his patrol car back; Keith was able to squeeze back out of the driveway, after striking the front bumper of Flores’s patrol car; according to Johnson, there was no damage to Flores’s patrol car from Keith’s striking of the bumper.
 

 Several times while on surface streets, Johnson had directed Flores to stop the Altima by using a pursuit immobilization technique (PIT) maneuver, but Flores had used his discretion to decline those first few times because Flores believed the conditions were not safe; either the speed of the pursuit vehicle or the presence of bystanders made the maneuver unsafe. Although both Johnson and Flores had received some training on the use of the PIT maneuver, Flores had never used it to stop a suspect before. According to the CHP manual on vehicle pursuit policy, the PIT maneuver is a form of ramming; the manual stated that “ramming is the deliberate act of impacting a violator’s vehicle with another vehicle to functionally damage or otherwise force the violator’s vehicle to stop. The [PIT] is a form of ramming and if utilized, should be identified as such.” According to both Johnson and Flores, the PIT maneuver should not be used at speeds in excess of 35 miles per hour. Johnson testified that the PIT maneuver ends the pursuit because when the newer vehicles spin out or collide, a switch cuts off the fuel to prevent a fire, and the car’s engine shuts off. According to Flores’s understanding, the PIT maneuver is not ramming, or an intentional crash; rather it is “more of an immobilization technique,” intended to make the car spin out and the engine turn off.
 

 About 4:14 p.m., when the Altima was eastbound on Evergreen Street, a frontage road near the freeway where there were no pedestrians and no traffic, Flores rammed the rear of the Altima, causing it to spin out counterclockwise to his left; Flores continued straight east, but the Altima went over the curb and sidewalk and the right passenger side of the Altima collided with an abutment wall on the northeast side of the intersection of Evergreen and Duncannon Streets. Keith was taken into custody and then to the hospital; plaintiff was taken to the hospital. According to Flores and Johnson, who were looking at their speedometers at the time of the PIT
 
 *195
 
 maneuver, Flores and the Altima were going about 32 miles per hour; Flores admitted that just prior to impact, he “did accelerate to catch the vehicle when I was to the left rear.”
 

 In Keith’s opinion, he was not traveling more than 35 miles per hour. According to an accident report of an Officer Aleria, who had used news media aerial videotapes, Flores’s patrol car and the Altima were traveling between 47 and 49 miles per hour at the time of the PIT maneuver. Flores testified that if they were traveling at 47 to 49 miles per hour, he would not have done the PIT maneuver, as he believed it was unsafe at that speed. At the time of the PIT maneuver, Flores believed that the risks of harm from the PIT maneuver were less than the risks of harm if the pursuit continued; the driver of the Altima had sometimes speeded, had driven erratically and recklessly through neighborhoods, and had already rammed Flores’s patrol car in evading arrest; Flores believed that continuing the pursuit was not safe for bystanders or for himself, and the area of the PIT maneuver was a good area, because there was no pedestrian or vehicle traffic.
 

 According to the CHP radio logs, a CHP radio dispatch went out at 3:41 p.m., about a half-hour before the PIT maneuver, that Adelanto police knew the driver of the stolen Altima to be “Jessie Keith,” a male juvenile Hispanic, 13 years old, and that the Altima was “cold plated,” meaning that the license plate had been switched so that if the police ran the number, it would not come back stolen. A dispatch at 3:42 p.m. stated that Keith was washing his neighbor’s car and she gave him the keys; Keith took the car; he was not known to carry a weapon.
 

 Johnson admitted that he “heard a radio [broadcast] that [the pursuit involved a] cold plated vehicle and juveniles. I did not know their age, and I didn’t know who they were.” Johnson also testified that the driver did not look juvenile to him, and that he believed the driver was wanted for felony car theft and also that the car’s occupants had possibly thrown drugs out of the car.
 
 [1]
 
 Johnson testified that if he had known that the driver was a juvenile whose identity was known, he would have canceled the pursuit and arrested Keith later.
 

 
 *196
 
 According to Flores, he had limited information during the pursuit; he did not remember getting any radio broadcasts about the driver being a juvenile, that his identity was known, or that he had taken a neighbor’s car; if he had known the driver and passenger were 14-year-old juveniles that had been identified, he would have aborted the pursuit because they could have been apprehended later. At the time of the PIT maneuver, his intent was to effect the arrest of the driver for felony vehicle theft and possibly reckless evading, which can be a felony. Both Flores and Johnson were also aware at the time of the pursuit that there had been reports that items thought to be drugs or drug-related items had been thrown from the Altima. In Flores’s opinion, the driver was a pretty good driver; during the pursuit, he never lost control of the car; he never saw anyone in the car point a weapon at him or throw anything out of the car at him. Flores also admitted that he did not see the Altima in any near collision with other vehicles on the streets, and that the sheriff was assisting with traffic control on the streets. Flores also testified that radio logs show that someone in CHP knew the identity of the driver before the PIT maneuver.
 

 B.
 
 Procedural History.
 

 The first amended complaint (complaint) contains three causes of action; the first two causes of action are state law claims for (1) assault and battery and (2) negligence, both premised on the alleged use of unreasonable force in effecting an arrest. The state law claims, asserted against all defendants, allege that Flores, acting in the course and scope of his employment by the CHP and the State of California, under color of state law, deliberately, intentionally and recklessly, or negligently, caused his patrol car to strike the left rear of the Altima; such allegedly excessive and lethal force constituted an unreasonable seizure of plaintiff’s person; as a result of the impact, the driver of the Altima lost control of the car and collided with a concrete retaining wall, inflicting major injuries on plaintiff. Plaintiff alleges that defendants knew or should have known that Keith was a juvenile and an inexperienced driver; the owner of the Altima had reported the theft before the pursuit occurred.
 

 
 *197
 
 The third cause of action, based on federal law, is captioned deprivation of civil rights under color of state law under 42 United States Code sections 1983 and 1988(a), and is not asserted against the State of California, but against defendants Flores, Johnson, and Hannigan; Hannigan is the CHP Commissioner. Plaintiff alleges that Johnson, pursuant to the directions of Hannigan, wrongfully and unlawfully ordered Flores to ram the Altima in which plaintiff was a passenger; thereafter, Flores unlawfully and unreasonably seized plaintiff’s person, when he rammed the Altima; the alleged use of excessive and lethal force constituted an unreasonable seizure of plaintiff’s person and violated his Fourth Amendment rights.
 

 After answering the complaint, defendants moved for summary judgment. As to the State of California, the motion asserted that the state was entitled to summary judgment on the state law causes of action on the ground that it is undisputed that it is immune from liability under Vehicle Code section 17004.7 (hereinafter section 17004.7).
 
 [2]
 
 The individual defendants moved for summary judgment on the state law claims on the ground that they were immune from liability under Vehicle Code section 17004 (hereinafter section 17004); in addition, Hannigan contended that he is immune from liability pursuant to Government Code section 820.8.
 
 [3]
 

 With respect to the section 1983 cause of action, defendants contended that plaintiff failed to state a valid claim because he was not “seized” within the meaning of the Fourth Amendment; even if there were a seizure, it was
 
 *198
 
 reasonable, in light of the circumstances and the danger posed by the fleeing vehicle. Defendants also asserted immunity under the qualified immunity doctrine, alleging that they are shielded from liability unless their actions violate clearly established statutory or constitutional rights of which a reasonable person would have known; defendants asserted that in 1994 the law regarding PIT maneuvers was not clearly established and a reasonable officer could have believed that using the PIT maneuver here was lawful. Hannigan also asserted that, as a supervisor, he has no liability under section 1983 because he had no knowledge of his subordinates’ conduct and was not personally involved in the alleged constitutional deprivation.
 

 In opposition to the motion, and in relation to the section 1983 claim, plaintiff submitted a declaration of police expert D. P. Van Blaricom (Van Blaricom), a former police chief of Bellevue, Washington. Van Blaricom declared that in his professional opinion, Johnson and Flores knew or should have known the identity of the driver of the Altima and that he was only 13 years old; the seizure involved an objectively unreasonable use of excessive and deadly force; the conduct of Flores and Johnson violated CHP’s own adopted standard of care in that the policy provides that pursuit should not be undertaken if the subjects can be identified to the point where later apprehension can be accomplished, and ramming should not occur when the speed of the pursued vehicle or the pursuing vehicle is in excess of 35 miles per hour. Van Blaricom also declared that at the time of the incident, it had been clearly established by law and well known to adequately trained law enforcement officers since 1985 that deadly force may not be used to prevent the escape of a suspect who has committed no greater crime than auto theft.
 

 Plaintiff also argued in opposition to the motion that the immunity of section 17004 does not apply to the individual officers because it applies only to accidents, and defendants’ conduct herein was an intentional and deliberate striking of the Altima. Plaintiff contended that section 17004.7, subdivision (b), did not afford the state immunity here because “plaintiff’s injuries were proximately caused by a decision to use excessive and lethal force to apprehend him, rather than as a result of a police pursuit,” and his injuries are not alleged to have arisen “from the pursuit.” With respect to the federal claim, plaintiff maintained that he was indeed seized within the meaning of the Fourth Amendment, and triable issues of fact exist as to whether the seizure was unreasonable. Plaintiff also contended that the qualified immunity doctrine did not provide defendants immunity because the law was well established since 1985 that deadly force may not be used to prevent escape of a suspect who committed auto theft, and that use of the patrol car to stop the suspect here constituted use of deadly force.
 

 Plaintiff expressly admitted that CHP had a written vehicle pursuit policy in effect at the time of the incident, that the policy was found to comply with
 
 *199
 
 the minimum standards set forth in section 17004.7, subdivision (c), and there had been no substantive changes to the pursuit policy since 1991. (See fn. 2,
 
 ante.)
 

 After hearing, the court granted the motion for summary judgment. The written order granting summary judgment recites that summary judgment was granted on the state law causes of action on the grounds that defendants Flores and Johnson are immune from liability under section 17004; defendant Hannigan is immune from liability under Government Code section 820.8, and the state is immune from liability under section 17004.7. With respect to the federal claim, the court stated that the seizure was not unreasonable as a matter of law, and even if a valid Fourth Amendment violation existed, defendants were entitled to immunity under the qualified immunity doctrine because a reasonable officer could have believed their actions to have been lawful under the circumstances, and “plaintiff failed to identify any material fact which would prevent the finding that the seizure was reasonable and that the qualified immunity doctrine applied.”
 

 Plaintiff filed timely notice of appeal from the judgment. (1) In reviewing that judgment, we apply the following principles: A defendant moving for summary judgment has the burden of establishing a complete defense or negating each of the plaintiff’s theories and establishing the action is without merit.
 
 (Colvin
 
 v.
 
 City of Gardena
 
 (1992) 11 Cal.App.4th 1270, 1275-1276 [15 Cal.Rptr.2d 234].) Because the trial court’s ruling on a motion for summary judgment is one of law based upon the papers presented, the appellate court makes an independent determination of their construction and effect.
 
 (Id.
 
 at p. 1276.)
 

 I
 

 State Law Claims
 

 With respect to the issue of immunity of the State of California under section 17004.7, subdivision (b), appellant contends that the trial court erred in concluding that the instant case fell within the foregoing statute because there was evidence that there was not a “collision” within the statute, but an intentional and deliberate striking or ramming of the pursued vehicle by the police vehicle. Appellant contends that section 17004.7 does not cover all collisions, but only “unintentionally and/or negligently inflicted injury on innocent third parties,” and further, the intentional ramming by Flores’s car here was a separate act, not part of the pursuit, and not a “collision.” As appellant’s contentions present solely issues of statutory interpretation, which are issues of law, we make an independent determination of those issues. (See
 
 Billester
 
 v.
 
 City of Corona
 
 (1994) 26 Cal.App.4th 1107, 1114 [32 Cal.Rptr.2d 121].)
 

 
 *200
 
 We conclude that as a matter of law the facts of the instant case fall within the statutory language because appellant sustained injuries resulting from a collision of a vehicle being operated by Keith, an actual violator of the law who was being, or had been, pursued by a peace officer in a motor vehicle. Appellant’s assertions that the statutory immunity only applies to collisions that occur during the course of the actual pursuit and to collisions that do not involve any intentional or deliberate acts of the pursuing police officers are not supported by any statutory language and constitute attempts to read provisions into the statute that are not there.
 
 [4]
 
 Moreover, appellant fails to cite any applicable law to support his tortured reading of section 17004.7, subdivision (b). (See fn. 2,
 
 ante.)
 

 The statute is silent as to the nature of the conduct of the peace officers engaged in the pursuit. There is no express statutory requirement that the pursuit by the peace officer be conducted in a particular manner or have a particular type of cause and effect relationship with the collision; the statute requires that the plaintiff’s injuries result from the “collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued by a peace officer . . . .” (§ 17004.7, subd. (b).) Thus, even if the PIT maneuver is characterized as a “separate act” and not part of the pursuit, appellant has cited no authority to support the proposition that the statute does not apply; rather, it remains undisputed that appellant’s injuries were a result of the collision of a vehicle being operated by Keith, an actual violator of the law who had been, or believed that he was, pursued by a peace officer.
 

 “Section 17004.7 was enacted in 1987 to provide immunity to governmental entities which previously had enjoyed only limited immunity while their police officer employees were entirely immune under section 17004.”
 
 (Colvin
 
 v.
 
 City of Gardena, supra,
 
 11 Cal.App.4th at p. 1277.) This provision was “
 
 [1]
 
 “intended to encourage agencies to adopt
 
 express guidelines
 
 which should reduce the frequency of accidents, while leaving to these agencies the fundamental law enforcement decisions about when to undertake a pursuit, free from threats of liability.” ’ ”
 
 (Id.
 
 at p. 1278.) Thus, the provision “immunizes public agencies from liability for injuries caused by
 
 *201
 
 suspect-driven vehicles in police pursuits if they adopt written policies that cover four criteria prescribed by the Legislature. These are: (1) supervisory control, (2) responsibility for primary and secondary units, (3) interjurisdictional considerations and (4) when to initiate a pursuit and when to terminate it.”
 
 (McGee
 
 v.
 
 City of Laguna Beach
 
 (1997) 56 Cal.App.4th 537, 542 [65 Cal.Rptr.2d 506].)
 

 (2b) It is not disputed by appellant herein that the CHP vehicle pursuit policy met the requirements of section 17004.7, subdivision (c). All of the cases cited by appellant to support his arguments pertaining to his interpretation of section 17004.7, subdivision (b), actually deal with the issue of whether an entity’s vehicle pursuit policy meets the criteria in subdivision (c) of section 17004.7. (See
 
 Berman
 
 v.
 
 City of Daly City
 
 (1993) 21 Cal.App.4th 276 [26 Cal.Rptr.2d 493];
 
 Billester
 
 v.
 
 City of Corona, supra,
 
 26 Cal.App.4th 1107;
 
 Brumer
 
 v.
 
 City of Los Angeles
 
 (1994) 24 Cal.App.4th 983 [29 Cal.Rptr.2d 515];
 
 Colvin
 
 v.
 
 City of Gardena, supra,
 
 11 Cal.App.4th 1270;
 
 McGee
 
 v.
 
 City of Laguna Beach, supra,
 
 56 Cal.App.4th 537;
 
 Payne
 
 v.
 
 City of Perris
 
 (1993) 12 Cal.App.4th 1738 [16 Cal.Rptr.2d 143];
 
 Weiner
 
 v.
 
 City of San Diego
 
 (1991) 229 Cal.App.3d 1203 [280 Cal.Rptr. 818].)
 

 Although the foregoing cases were addressing issues other than me issues raised by appellant here, some of the discussions are instructive. For example, the court in
 
 Brumer
 
 v.
 
 City of Los Angeles, supra,
 
 24 Cal.App.4th at page 987 stated that “if the agency adopts a pursuit policy which meets the statutory requirements, then immunity results. The extent to which the policy was implemented in general and was followed in the particular pursuit is irrelevant. [Citations.] Judicial supervision of the implementation of police department pursuit policies would defeat the purpose of the statutory immunity.” Further, “[o]ur obligation to interpret police policies for purposes of . . . section 17004.7 does not give us the supervisory power to dictate good (or bad) law enforcement tactics.”
 
 (McGee
 
 v.
 
 City of Laguna Beach, supra,
 
 56 Cal.App.4th at p. 548.)
 

 In the instant case it is undisputed that the State of California had adopted a written pursuit policy that met the requirements of section 17004.7, subdivision (c), including the requirement that the policy contain adequate criteria covering the initiation and termination of the vehicle pursuit. However, appellant’s contention—that the intentional and deliberate nature of the PIT maneuver used to terminate the pursuit here removes the state from the immunity provisions of section 17004.7, subdivision (b)—is inconsistent with the conclusion that the CHP pursuit policy, which contains the PIT maneuver, meets the provisions of subdivision (c) of the statute. In other words, under the guise of interpreting the term “collision” in subdivision (b),
 
 *202
 
 appellant attempts to import into the statute certain substantive requirements for vehicle pursuit tactics which are not required by statute and which may be inconsistent with the pursuit policy which has been held sufficient under subdivision (c) of section 17004.7. As stated above, it is not for the courts to evaluate the wisdom of any particular aspect of the pursuit policy.
 

 For all of the foregoing reasons, we conclude that summary judgment was properly granted in favor of the State of California on Weaver’s state law claims because the state established it is entitled to immunity under section 17004.7 and appellant has failed to establish the statutory provision does not apply under the facts of the instant case.
 

 With respect to the state law causes of action against respondents Johnson and Flores, we conclude that the trial court properly granted summary judgment on the basis of the immunity afforded by section 17004, as the facts of this case fall squarely within the terms of section 17004. (See fn. 3,
 
 ante.)
 
 Appellant cites the same authorities and makes the same arguments with respect to section 17004 as he did with respect to section 17004.7; for similar reasons we find his arguments with respect to section 17004 to be without merit and unsupported by any applicable authority.
 

 As to the state law claims against respondent Hannigan, we conclude that the trial court properly granted summary judgment in his favor because his declaration offered in support of the motion negated the allegations of the complaint pertaining to his own allegedly wrongful actions, and Government Code section 820.8 affords him immunity from liability based on the acts of his subordinates, Johnson and Flores.
 

 The complaint herein alleges that when Johnson directed Flores to ram the Altima, Johnson was acting pursuant to the directions of Hannigan. Contrary to appellant’s characterization of the complaint, the complaint contains no allegations that Hannigan failed to adequately supervise or train his subordinates, although there are such allegations with respect to other defendants, the City of Adelanto, State of California, and Does 151 to 200. In support of the summary judgment motion, Hannigan provided a declaration stating that as the CHP Commissioner from 1989 to 1995, his office was based in Sacramento, his duties did not involve the day-to-day operations of any one CHP office, he was not involved in training officers in the PIT technique, he did not direct the PIT maneuver to be used during the pursuit at issue, and he was in no way personally involved in the incident herein. He also declared that he was not aware of any complaints concerning Flores’s or Johnson’s job performance. The defendants’ separate statement supporting the summary judgment motion contained several facts as set out in Hannigan’s
 
 *203
 
 declaration, and Weaver provided no evidence to counter Hannigan’s declarations.
 

 In moving for summary judgment, Hannigan was obligated to address only the allegations and theories asserted against him in the complaint. Inasmuch as Hannigan negated all of the allegations in the complaint pertaining to his own conduct (as well as negating issues of negligent supervision and training which are not alleged against him in the complaint), and there was no contrary evidence creating any dispute of fact on such allegations, he was entitled to summary judgment on the state law claims alleged in the complaint. To the extent that any of the state law theories of liability asserted in the complaint were premised on his being held vicariously liable for the acts of his subordinates, we conclude that the trial court properly concluded that Government Code section 820.8 affords him immunity as to such theories. (See fn. 3,
 
 ante.)
 

 The trial court thus properly granted summary judgment in favor of respondents on Weaver’s state law claims. We now proceed to address the section 1983 claim as to respondents Flores, Johnson and Hannigan.
 

 II
 

 Section 1983 Cause of Action
 

 “It is well established that a constitutional cause of action is wholly separate and independent from a state cause of action, even where the same conduct gives rise to both. [Citation.] Although a plaintiff’s cause of action may be barred by public entity immunity under state law, this does not shield a city or its employees from liability under section 1983 for deprivation of a person’s civil rights under color of law.”
 
 (Berman
 
 v.
 
 City of Daly City, supra,
 
 21 Cal.App.4th at pp. 285-286.) “State courts look to federal law to determine what conduct will support an action under section 1983. [Citation.] The first inquiry in any section 1983 suit is to identify the precise constitutional violation with which the defendant is charged.” (21 Cal.App.4th at p. 286.)
 

 To determine whether Weaver has stated a claim based on a violation of the Fourth Amendment, we must determine if respondents’ conduct constituted a “seizure” and whether the seizure, if one occurred, was “unreasonable.” (Do
 
 novan
 
 v.
 
 City of Milwaukee
 
 (7th Cir. 1994) 17 F.3d 944, 948.) In this case, the trial court clearly determined that the PIT maneuver involved a seizure within the meaning of the Fourth Amendment. We agree.
 

 “Almost a decade ago, the Supreme Court dealt with a vehicular collision involving a so-called ‘deadman’s roadblock,’ designed and constructed to
 
 *204
 
 block off an entire roadway by placing an unilluminated tractor-trailer unit just beyond a curve and locating a police cruiser directly in front of the roadblock with its headlights aimed at the oncoming target vehicle, thereby blinding the driver to the impassable highway obstruction just around the curve.
 
 Brower v. Inyo County,
 
 489 U.S. 593, 594, 109 S.Ct. 1378, 1379-80, 103 L.Ed.2d 628 (1989).
 
 Brower
 
 nevertheless enunciates a rule that renders its egregious facts largely immaterial to the required Fourth Amendment inquiry into whether a roadblock ‘seizure’ has occurred, [ft] Writing for the Court, Justice Scalia explained that a Fourth Amendment seizure occurs ‘only when there is a governmental termination of freedom of movement
 
 through means intentionally applied,’ id.
 
 at 597, 109 S.Ct. at 1381-82 . . . . The majority opinion went on to say: ‘[A] roadblock is not just a significant show of authority to induce a voluntary stop, but it is designed to produce a stop by physical impact if voluntary compliance does not occur. . .
 
 .’Id.
 
 at 598, 109 S.Ct. at 1382 (citations omitted).”
 
 (Seekamp
 
 v.
 
 Michaud
 
 (1st Cir. 1997) 109 F.3d 802, 805.) “The
 
 Brower
 
 standard for determining whether a Fourth Amendment seizure has occurred applies whenever ‘there is a governmental termination of freedom of movement through means intentionally applied.’ ” (109 F.3d at p. 806.)
 

 “A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking must be willful. This is implicit in the word ‘seizure,’ which can hardly be applied to an unknowing act.... In sum, the Fourth Amendment addresses ‘misuse of power,’ not the accidental effects of otherwise lawful government conduct.”
 
 (Horta
 
 v.
 
 Sullivan
 
 (1st Cir. 1993) 4 F.3d 2, 9-10.) Moreover, it has been held that a passenger in a car being pursued by police and stopped by a police roadblock was “ ‘seized’ for purposes of the Fourth Amendment when the officers deliberately placed the roadblock in front of the car in which they knew she was a passenger.”
 
 (Jamieson
 
 v.
 
 Shaw
 
 (5th Cir. 1985) 772 F.2d 1205, 1210.)
 

 In this case, we conclude that the evidence is undisputed that Weaver was subject to a seizure within the meaning of the Fourth Amendment. It was without dispute that Johnson and Flores knew that there were two individuals in the Altima and intended that Flores employ the PIT maneuver, which Flores defined in his deposition as an “immobilization” technique. Thus, the officers admittedly intended to stop the Altima. It was also undisputed that the CHP manual defined ramming, which encompassed the PIT maneuver, as “the deliberate act of impacting a violator’s vehicle with another vehicle to functionally damage or otherwise force the violator’s vehicle to stop.” Accordingly, by definition, the PIT maneuver is a seizure within the meaning of the Fourth Amendment. The fact that Flores and Johnson may not have intended any injury to Weaver as a result of the PIT maneuver is
 
 *205
 
 irrelevant to the issue of whether a seizure occurred because there was nevertheless an intentional acquisition of physical control over the Altima. (See
 
 Donovan
 
 v.
 
 City of Milwaukee, supra,
 
 17 F.3d at pp. 948-949 [officer’s intentionally backing his squad car into the path of a fleeing motorcycle, sending both driver and passenger airborne, was a seizure].) Moreover, respondents draw too fine a line between an intentional act and its unintended consequences. As explained in
 
 Brower,
 
 “[W]e cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. It was enough here, therefore, that, according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped.”
 
 (Brower
 
 v.
 
 County of Inyo
 
 (1989) 489 U.S. 593, 598-599 [109 S.Ct. 1378, 1382, 103 L.Ed.2d 628].)
 

 Of course, as the
 
 Brower
 
 court observed, “ ‘Seizure’ alone is not enough for § 1983 liability; the seizure must be ‘unreasonable.’ ” (489 U.S. at p. 599 [109 S.Ct. at pp. 1382-1383].)
 

 “We determine the ‘reasonableness’ of a Fourth Amendment seizure by balancing “‘the nature and quality of the intrusion on the individual’s Fourth Amendment interests” against the countervailing governmental interests at stake.’
 
 Graham v. Connor,
 
 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (quoting
 
 Tennessee v. Garner,
 
 471 U.S. 1, 8, 105 S.Ct. 1694, 1699-1700, 85 L.Ed.2d 1 (1985)). The Fourth Amendment reasonableness test requires careful attention to the circumstances in the particular case.”
 
 (Seekamp
 
 v.
 
 Michaud, supra,
 
 109 F.3d at p. 806.) “Moreover, ‘a viable excessive force claim must demonstrate that the police defendant’s] actions were not objectively reasonable, viewed in the light of the facts and circumstances confronting him and without regard to his underlying intent or motivation.’ ”
 
 (Ibid.) “Graham
 
 identifies three factors for evaluating whether the force used to effect a seizure was objectively reasonable: (1) the severity of the crime, (2) whether there was ‘an immediate threat to the safety of the officers or others’; and (3) whether the suspect was,
 
 inter alia,
 
 ‘actively resisting arrest or attempting to evade arrest by flight.’ ” (109 F.3d at p. 806.) Thus, for example, in evaluating the question whether the force applied in a seizure by roadblock was proportionate to the need for action, the court held that it is proper to consider the magnitude of the need for the roadblock, the relationship of the level of force used to that need, the severity of injuries to any passenger, and the motives of the police officers.
 
 (Jamieson
 
 v.
 
 Shaw, supra,
 
 772 F.2d at p. 1211.)
 

 
 *206
 
 “A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But ‘[t]he fact that the protection of the public might have been accomplished by less intrusive means does not itself render the search unreasonable.’ The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it.”
 
 (Seekamp
 
 v.
 
 Michaud, supra,
 
 109 F.3d at p. 808.)
 

 In
 
 Tennessee
 
 v.
 
 Gamer
 
 (1985) 471 U.S. 1 [105 S.Ct. 1694, 85 L.Ed.2d 1], the Supreme Court “stated both a general rule—that ‘[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead’—and an exception—‘[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.’ Gamer, 471 U.S. at 11, 105 S.Ct. at 1701.”
 
 (Donovan
 
 v.
 
 City of Milwaukee, supra,
 
 17 F.3d at p. 949.) “The Supreme Court has not clearly delineated the scope of the
 
 Gamer
 
 exception. As the Ninth Circuit observed in its consideration of
 
 Brower
 
 on remand, ‘It is not clear from
 
 Gamer
 
 that the “substantial threat” requirement is satisfied by danger that is present only as a result of police pursuit.’
 
 Brower v. County of Inyo,
 
 884 F.2d 1316, 1317 n. 1 (9th Cir. 1989). For example, the Sixth Circuit opinion reviewed by the Court in
 
 Gamer
 
 held that deadly force is only appropriate ‘when the suspect poses a threat to the safety of the officers or a danger to the community if left at large.’ [Citations.] In a later case,
 
 Smith
 
 v.
 
 Freland,
 
 954 F.2d 343 (6th Cir.), cert, denied . . . , the Sixth Circuit relied on the
 
 Gamer
 
 exception in affirming a district court decision holding that a police officer who fatally shot a misdemeanant driver trying to escape after a high speed chase had not affected [szc] an unreasonable, seizure. The decedent driver, Smith, initiated a wild chase after speeding and running a stop sign. . . . Later, after the police officer had cornered Smith on a dead-end residential street, Smith attempted to flee by crashing into the officer’s car and smashing into a fence and gate in front of the local swimming pool. As Smith zoomed past the squad car, the police officer fired a single shot that struck and killed the driver.
 
 Id.
 
 954 F.2d at 344. The district court held that the
 
 Garner
 
 exception applied despite its finding that ‘Officer Schulcz was not in any immediate personal danger at the time he discharged his weapon.’ . . . The Sixth Circuit affirmed, reasoning that, even unarmed, Smith was dangerous because of the way he was operating the car.”
 
 (Donovan
 
 v.
 
 City of Milwaukee, supra,
 
 17 F.3d at p. 950, italics omitted.)
 

 In
 
 Donovan,
 
 where it was alleged that the officer intentionally backed his patrol car into a fleeing motorcycle, the court reasoned: “[H]owever, we
 
 *207
 
 cannot say with any degree of assurance that ‘even today[,] if defendants did everything the plaintiffs alleged, still they did not violate the Constitution.’ [Citation.] After reviewing the cases, we are very skeptical that the intentional striking of the fleeing suspect’s vehicle could constitute a reasonable seizure in all circumstances. As noted above, . . . ‘reasonableness’ in each case is highly fact-specific and cannot be reduced to a precise definition or test. [Citation.] Here, for example, we distinguish between a motorcycle and an automobile in terms of the likelihood that a particular seizure amounts to the use of deadly force. Again, we are aware that exigent circumstances require snap judgments from police officers as they decide whether and how to seize a suspect. . . .Yet, while giving due deference to difficult judgment calls made on the street, we also must insure the rights of citizens, even fleeing felons, to be free from unreasonable seizures. Police officers may, and ought to, pursue fleeing suspects, and where those suspects present ‘a threat of serious physical harm, either to the officers] or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.’ [Citation.] But not every fleeing suspect poses a grave danger. In this case, for example, there is no evidence that Reinartz imperiled anyone (except himself and his willing passenger); he was driving his motorcycle through empty city streets in the wee hours of the morning. Nothing in the record parallels the circumstances of
 
 Freland,
 
 where the fleeing driver twice swerved his vehicle in the direction of the police cruiser and maneuvered his car through lawns, fences, and gates in a residential neighborhood. Therefore, accepting Donovan’s version of the facts, we believe that a trier of fact could find that [the officer’s] intentional striking of Reinartz’s motorcycle violated the Fourth Amendment.” (17 F.3d at pp. 950-951.)
 

 When we apply the foregoing principles to the instant record, we must conclude that the trial court properly granted summary judgment on the ground that the seizure was reasonable as a matter of law because when the record is viewed most favorably to Weaver, respondents’ actions were objectively reasonable.
 

 We acknowledge that disputed factual issues and conflicting inferences exist on the instant record as to what Johnson knew about the driver of the Altima at the time he was directing Flores to undertake the PIT maneuver, and also as to the speeds of the Altima and Flores’s vehicle. Another officer investigating the accident had prepared a report indicating that both the Altima and Flores’s vehicle were traveling at between 47 and 49 miles per hour at the time of the PIT maneuver, thus creating a factual dispute as to how fast the cars were traveling. Because there is a factual dispute as to how fast the cars were traveling, there is a factual dispute as to whether the use of
 
 *208
 
 the PIT maneuver under such circumstances constituted the use of deadly force.
 

 The instant record also permits the reasonable inference that Johnson may have known at the time of the pursuit that the driver had been identified by name, even though he denied such knowledge in his deposition. This is so because there is no indication that Johnson received any information other than over the radio in his patrol car; the portion of the radio log appearing in our record indicates that the same radio dispatch which went out at 3:41 p.m. containing the information that the Altima had been “cold plated,” also contained the information that Adelanto police knew the driver to be Jesse Keith and that he was 13 years old. It is unclear from our record how Johnson could have received the information about the Altima being “cold plated” unless it was from the same dispatch relaying the information identifying the name of the driver and his age. This information was sent out over the CHP radio roughly a half-hour before the pursuit was terminated by use of the PIT maneuver. Accordingly, the state of the instant record permits a reasonable inference that Johnson, and perhaps Flores, knew that the name and age of the driver were known to the CHP at the time the PIT maneuver was employed.
 

 At this juncture, and given the state of the instant record, Weaver thus may be able to prove that Flores and the Altima were traveling about 47 miles per hour at the time of the PIT maneuver, that a PIT maneuver performed at this speed may have constituted the use of deadly force, and that Johnson and possibly Flores knew the fleeing driver had been identified and was a juvenile. Thus, Flores and Johnson would be entitled to summary judgment on the ground that the seizure was reasonable only if an objectively reasonable officer could believe deadly force could be lawfully used under the circumstances viewed most favorably to appellant.
 

 We conclude that as a matter of law no rational jury could find the instant seizure unreasonable under the circumstances here. A 14-year-old driver who has led police on a 2-hour pursuit over several freeways and through residential neighborhoods at unsafe speeds and in disregard of the traffic laws clearly lacks the skills and judgment of a mature driver. Keith exhibited a wanton disregard for public safety and a willingness to persist in violent conduct to evade the police, even ramming a police car in his attempt to escape when he clearly had an opportunity to stop the pursuit in a safe
 
 *209
 
 manner when he had pulled into a driveway.
 
 [5]
 
 According to the officers, so many bystanders had come out of their homes while Keith was circling through the residential streets that the area resembled a “parade route.” With so many vulnerable bystanders in the area, and an unpredictable, youthful driver who had clearly expressed a willingness to engage in violent conduct to continue his flight, the officers acted reasonably in employing deadly force to stop Keith.
 

 The facts here are similar to those in
 
 Smith
 
 v.
 
 Freland
 
 (6th Cir 1992) 954 F.2d 343, involving the fatal shooting of a misdemeanant (adult) driver after a wild chase, and are distinguishable from those in
 
 Donovan
 
 v.
 
 City of Milwaukee, supra,
 
 17 F.3d 944, involving the intentional backing of a patrol car into a fleeing motorcycle driving through empty streets in the early morning. It is clear in
 
 Donovan
 
 that the factors that tipped the scale in favor of the court’s finding an unreasonable seizure were the lack of peril to the public and the vulnerability of the plaintiff motorcycle driver, the court distinguishing between “a motorcycle and an automobile in terms of the likelihood that a particular seizure amounts to the use of deadly force.” (17 F.3d at p. 951.) On the other hand, Keith, as in
 
 Smith,
 
 posed a danger to innocent bystanders and the police officers by the manner in which he was driving the car and his demonstrated indifference to a show of authority by law enforcement. It was thus objectively reasonable for the officers herein to conclude that there was a greater risk of harm in allowing Keith to continue driving and to remain at large rather than in attempting to arrest him with the use of the PIT maneuver. A reasonable officer also could have concluded that a youthful, inexperienced driver like Keith posed a greater risk to public safety than the adult driver in
 
 Smith.
 
 We thus conclude that summary judgment was properly granted on the ground that the seizure was reasonable as a matter of law.
 
 [6]
 

 In light of the foregoing, we need not address the issue of whether respondents are entitled to the shield of the qualified immunity doctrine.
 

 
 *210
 
 Whether or not the seizure was reasonable, we conclude that with respect to the federal claim against Hannigan, the trial court also correctly concluded that he was entitled to summary judgment because it was undisputed that he had no supervisory liability under section 1983. Under principles of liability set out in
 
 Shaw
 
 v.
 
 Stroud, supra,
 
 13 F.3d 791, 799 (see fn. 6,
 
 ante),
 
 it was undisputed that Hannigan’s conduct did not meet any of the elements for liability because he had no actual or constructive knowledge that his subordinates were engaging in unconstitutional conduct, there was no deliberate indifference to, or tacit authorization of, such conduct, and there was no “affirmative causal link” between any conduct of Hannigan and any purported constitutional injury suffered by Weaver. Accordingly, summary judgment was properly granted as to Hannigan.
 

 Disposition
 

 The summary judgment is affirmed. The parties are to bear their own costs on appeal.
 

 Woods, J., and Neal, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied July 8, 1998.
 

 [1]
 

 Keith admitted at his deposition that the plaintiff had thrown some marijuana out the car window early in the pursuit, and also that plaintiff had thrown some tools out the window and onto the freeway in front of the officers’ cars. However, at the time of the pursuit by Johnson and Flores, there is nothing in the portion of the CHP radio log in our record (offered by plaintiff in opposition to the motion, and which apparently does not contain the entire CHP radio log on this incident) indicating that it was broadcast that it was suspected that anything, let alone drugs, were thrown from the car, so it is unclear how Johnson knew about the suspected drags being thrown from the car at the time of the pursuit, unless it was broadcast over the radio. If it was a matter not broadcast, but had appeared only in the reports made
 
 *196
 
 after the fact, then it would appear that at the time of his deposition, Johnson may have been confusing what he knew at the time of the pursuit with what he may have learned later. Johnson also testified in his deposition that he believed at the time of the pursuit that the passenger in the Altima appeared to be a blond female, and the radio dispatch log contains a reference to the passenger apparently being a blond juvenile female. Flores, however, did testify in his deposition that he remembered some radio traffic about “they had tossed something out of the vehicle, I believe that was on our frequency.” Flores testified that the preliminary running of the license plate on the Altima was done before he got involved in the pursuit, but he testified that he could not remember any radio broadcasts about the license plate being “cold plated,” but “I believe that the dispatcher reconfirmed the plate that we had and—my memory is really vague.”
 

 [2]
 

 Although plaintiff did not assert the third cause of action against State of California, it also moved for summary judgment on the section 1983 claim on the ground that it cannot be held liable thereunder; plaintiff expressly agreed that this point was undisputed, so we need not consider this issue further. Section 17004.7, subdivision (b) provides: “A public agency employing peace officers which adopts a written policy on vehicular pursuits complying with subdivision (c) is immune from liability for civil damages for personal injury to or death of any person or damage to property resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued by a peace officer employed by the public entity in a motor vehicle.” We need not set out the provisions of section 17004.7, subdivision (c) because it was undisputed by plaintiff that in 1991, in
 
 Kishida
 
 v.
 
 State of California
 
 (1991) 229 Cal.App.3d 329 [280 CaLRptr. 62], the CHP pursuit policy was found to comply with the minimum standards set forth in section 17004.7, subdivision (c).
 

 [3]
 

 Section 17004 provides: “A public employee is not liable for civil damages on account of personal injury to or death of any person or damage to property resulting from the operation, in the line of duty, of an authorized emergency vehicle while responding to an emergency call or when in the immediate pursuit of an actual or suspected violator of the law, or when responding to but not upon returning from a fire alarm or other emergency call.” Government Code section 820.8 provides: “Except as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person. Nothing in this section exonerates a public employee from liability for injury proximately caused by his own negligent or wrongful act or omission.”
 

 [4]
 

 Appellant’s claim that section 17004.7 applies only to “innocent third parties” is also without any statutory support. As noted by the court in
 
 Thomas
 
 v.
 
 City of Richmond
 
 (1995) 9 Cal.4th 1154 [40 Cal.Rptr.2d 442, 892 P.2d 1185], the “distinction between actions brought by third parties and by the fleeing suspect finds no support in the language of either [Government Code] section 845.8 or Vehicle Code section 17001.” (9 Cal.4th at p. 1164.) Moreover, in adopting section 17004.7, the Legislature did “give consideration to this general question, and did take action to increase the immunity afforded to public entities. . . . [H]owever, that action did not include . . . distinguishing between actions brought by suspects from those brought by third parties.” (9 Cal.4th at pp, 1164-1165.)
 

 [5]
 

 Johnson and Flores found out after Keith’s arrest that the residential driveway where Keith had momentarily stopped was that of his aunt; Keith testified that he was trying to get his aunt’s attention by circling around her neighborhood; his aunt was one of the bystanders, and according to Keith, recognized him as he drove around her neighborhood.
 

 [6]
 

 We are aware that the theory of liability asserted against Johnson is different than that asserted against Flores, because Johnson also may have been a supervisory official. A “supervisory official may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates. [Citations.] . . . [T]hat liability is not premised upon
 
 respondeat superior
 
 but upon ‘a recognition that supervisory indifference or tacit authorization of subordinates’ misconduct may be a causative factor in the constitutional injuries they inflict ....’”
 
 (Shaw
 
 v.
 
 Stroud
 
 (4th Cir. 1994) 13 F.3d 791, 798.) The three elements necessary to establish supervisory liability under section 1983 are: “(1) that the supervisor had actuad or constructive knowledge that his subordinate was engaged in conduct that posed ‘a pervasive and unreasonable risk’ of constitutional injury to citizens like the plaintiff; (2) that the supervisor’s response to that knowledge was so inadequate as to show ‘deliberate indifference
 
 *210
 
 to or tacit authorization of the alleged offensive practices’; and (3) that there was an ‘affirmative causal link’ between the supervisor’s inaction and the particular constitutional injury suffered by the plaintiff.” (13 F.3d at p. 799.) Even if Johnson is deemed a supervisory official in this case, summary judgment was properly granted in his favor because we conclude that the seizure was reasonable.