USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT No. 96-1923 HENRY C. SEEKAMP, JR., Plaintiff, Appellant, v. RONALD MICHAUD, et al., Defendants, Appellees.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________  ____________________ Before Cyr, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________  ____________________ Michael J. Waxman for appellant. _________________ Leanne Robbin, Assistant Attorney General, with whom Andrew ______________ ______ Ketterer, Attorney General, and Peter J. Brann, Assistant Attorney ________ _______________ General, were on brief for appellees.  ____________________ March 26, 1997  ____________________ CYR, Circuit Judge. Appellant Henry C. Seekamp, Jr., CYR, Circuit Judge. ______________ challenges a summary judgment ruling disallowing his civil rights claims against various Maine State Police ("MSP") officers and their supervisor, based on an alleged Fourth Amendment violation stemming from a roadblock established by the defendant officers on the Maine Turnpike. We affirm the district court judgment. I I BACKGROUND BACKGROUND __________ The material facts are not in dispute. At approximate- ly 1:00 a.m. on July 14, 1994, Seekamp left his parents' resi- dence in Scarborough, Maine, for the asserted purpose of picking up the pieces of his former life in Arkansas, where his relation- ship with a girlfriend and his career in the United States Air Force were abruptly ended by an automobile accident in April, 1993, which left him with a brain injury.  As Seekamp was proceeding south through a 50 m.p.h. zone on Route 1, his Chevrolet Monte Carlo was clocked at 63 miles per hour by Scarborough Police Sergeant Eugene O'Neill. After Seekamp failed to heed Sergeant O'Neill's signal to stop, O'Neill followed him into Saco where local police units joined the pursuit. Undeterred, Seekamp not only ignored the pursuing police vehicles but drove through the Maine Turnpike toll plaza at Saco, and onto a southbound lane, without stopping.  Alerted by Sergeant O'Neill, the MSP assumed further responsibility for the pursuit after learning that the driver of the Monte Carlo had eluded a police officer a felony under 2 Maine law. See Me. Rev. Stat. Ann., tit. 29-A, 2501-A (1994) ___ (repealed and replaced on January 1, 1995 by P.L. 1995, Ch. 65, codified as Me. Rev. Stat. Ann. tit. 29-A, 2414(3) (1996)). Situated farther south near the Biddeford exit, MSP Trooper Ronald Michaud took up the pursuit at approximately 1:35 a.m. In an effort to force Seekamp to a stop, Trooper Michaud attempted a "rolling roadblock" by driving in front of the Monte Carlo then decelerating to force Seekamp to slow as well. Michaud soon abandoned the rolling roadblock when Seekamp responded with reckless attempts to get around the police cruiser.  At approximately 1:45 a.m., Trooper Michaud received a radio dispatch to the effect that Seekamp's father had advised that his brain-injured son was operating the Monte Carlo but was unarmed and neither suicidal nor under the influence of alcohol or drugs. Trooper Michaud considered the information both stale and unverifiable because Seekamp, Sr., could not have known what happened to his son after leaving the family home some 45 minutes earlier.  Meanwhile, MSP Sergeant Steven Beal and MSP Trooper Thomas Arnold had joined the pursuit north of the Wells exit. During this phase, Seekamp continued his erratic driving and was clocked by Trooper Michaud at speeds up to 97 miles per hour. About the same time and at Trooper Michaud's request, MSP Ser- geant Beal directed MSP Trooper Larry McAfee to establish a roadblock north of the York toll plaza.  The roadblock was set up approximately 800 feet north 3 of the York toll plaza, at the end of a 1500-foot straightaway. First, Trooper McAfee commandeered a flatbed tractor-trailer unit loaded with lumber sheathed in white plastic and directed that it be parked across the three southbound travel lanes, with its cab at the guardrail. Once in place, the tractor-trailer unit extended almost entirely across the southbound travel lanes. McAfee completed the blocking of the southbound travel lanes by parking his police cruiser at the rear of the tractor-trailer unit, with its headlights pointing north in the direction from which Seekamp would be approaching.  After turning on the cruiser's headlights, blue lights, and flashers, McAfee directed other tractor-trailers to park along the breakdown lane parallel to the blocked travel lanes. A fifty-foot gap was left between two of the tractor-trailer units parked in the breakdown lane, to permit vehicular traffic to proceed onto the breakdown lane and around the roadblock at slow speed, with police assistance. The headlights of the tractor- trailer unit at the northern end of the fifty-foot gap illuminat- ed the avenue of vehicular egress along the breakdown lane.  The entire roadblock area was brightly illuminated by overhead street lights, the lights from Trooper McAfee's cruiser, and the headlights of the commandeered tractor-trailer blocking the southbound travel lanes. In addition, upon arrival at the roadblock site to assist Trooper McAfee, MSP Trooper Kevin Curran parked his cruiser in a southbound travel lane with its flashers on and its headlights directed at the roadblock as well. 4 What with the bright white plastic sheathing around the lumber on the tractor-trailer unit blocking the southbound travel lanes, the roadblock area was visible from approximately 1500 feet along the straightaway approaching the York toll plaza.1 As the Monte Carlo approached the roadblock, it appeared to brake several times yet failed to come to a complete stop even though the pursuing police cruisers had slowed to allow Seekamp room to maneuver. Ultimately, it collided with the rear axle of the tractor-trailer unit parked across the southbound travel lanes, causing Seekamp a hairline fracture of the hip and a severe facial laceration. Seekamp brought suit under 42 U.S.C. 1983 against the subordinate MSP defendants, alleging Fourth Amendment violations; and against MSP Chief Alfred Skofield, Jr., for failure to provide adequate training and supervision. The district court awarded summary judgment to all defendants on the alternative grounds that the roadblock was reasonable and all defendants were entitled to qualified immunity. Seekamp v. Michaud, 936 F. Supp _______ _______ 23, 28-30 (D. Me. 1996).  ____________________ 1Defendants produced the uncontroverted affidavit of an expert who attested that a motor vehicle traveling at 100 miles per hour can come to a stop within 400 feet. He opined that there was ample room for Seekamp to bring the Monte Carlo to a full stop without contacting the roadblock. Moreover, the record reflects that Seekamp did slow to between 35 and 50 m.p.h. as he approached the roadblock. Finally, Seekamp testified at deposi- tion that he could have stopped the Monte Carlo but for the fact that its brakes were not functioning properly. 5 II II DISCUSSION2 DISCUSSION __________ 1. Subordinate MSP Defendants 1. Subordinate MSP Defendants __________________________ Seekamp claims the subordinate MSP defendants violated his Fourth Amendment right to be free from unreasonable seizures of his person. Since Seekamp acknowledges probable cause for a warrantless arrest, we need only determine whether the roadblock effected a Fourth Amendment seizure and, if so, whether it was reasonable.3  A. Did the Roadblock Effect a Fourth Amendment Seizure? A. Did the Roadblock Effect a Fourth Amendment Seizure? ____________________________________________________ The defendants contend that the roadblock did not constitute a Fourth Amendment seizure because it permitted vehicular traffic to maneuver through the fifty-foot opening designedly left between two of the tractor-trailer units parked in the breakdown lane to the right of the westernmost, southbound  ____________________ 2We review a grant of summary judgment de novo. Sanchez v. __ ____ _______ Alvarado, 101 F.3d 223, 227 (1st Cir. 1996). The district court ________ will be affirmed if "the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). 3As eluding a police officer is a felony, see Me. Rev. Stat. ___ Ann. tit. 29-A, 2501-A (1994), and Seekamp had been observed doing so, see supra at p. 2, there was probable cause for a ___ _____ warrantless arrest. See United States v. Sepulveda, 102 F.3d ___ _____________ _________ 1313, 1316 (1st Cir. 1996) ("[P]robable cause requires only that the police have 'reasonable grounds to believe' that [the sus- pect] had committed [a] crime."); see also Joyce v. Town of ___ ____ _____ _______ Tewksbury, 104 F.3d 507, 510-11 (1st Cir. 1997) (upholding _________ warrantless arrest based on probable cause in exigent circum- stances such as pursuit of fleeing felon); Me. Rev. Stat. Ann. tit. 17-A, 15 (A)(3) (West Supp. 1996) (permitting warrantless arrest by police officer with probable cause to believe arrestee committed or is committing Class C crime).  6 travel lane. We do not agree.4 Almost a decade ago, the Supreme Court dealt with a vehicular collision involving a so-called "deadman's roadblock," designed and constructed to block off an entire roadway by placing an unilluminated tractor-trailer unit just beyond a curve and locating a police cruiser directly in front of the roadblock with its headlights aimed at the oncoming target vehicle, thereby blinding the driver to the impassable highway obstruction just around the curve. Brower v. Inyo County, 489 U.S. 593, 594 ______ ____________ (1989). Brower nevertheless enunciates a rule that renders its ______ egregious facts largely immaterial to the required Fourth Amend- ment inquiry into whether a roadblock "seizure" has occurred.  Writing for the Court, Justice Scalia explained that a Fourth Amendment seizure occurs "only when there is a governmen- tal termination of freedom of movement through means intentional- _______ _____ ____________ ly applied," id. at 597; see also Landol-Rivera v. Cruz Cosme, __ _______ __ ___ ____ _____________ __________ 906 F.2d 791, 795 (1st Cir. 1990) (same), explaining that "it [is] enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place to achieve that  ____________________ 4We note that a great many 1983 claims are resolved under the doctrine of qualified immunity, see, e.g., Hegarty v. ___ ____ _______ Somerset County, 53 F.3d 1367, 1379, 1381 (1st Cir.), cert. ________________ ____ denied, 116 S. Ct. 675 (1995), without considering their consti- ______ tutional merit. Our most recent decision involving an alleged seizure by roadblock, Horta v. Sullivan, 4 F.3d 2, 15 (1st Cir. _____ ________ 1993) (declining to consider whether partial roadblock consti- tuted a seizure), was such a case. With that constitutional issue squarely presented in the case now before us, however, we take the occasion to discuss the merits in some detail with a view to affording a modicum of concrete guidance not often warranted in our earlier cases.  7 result." Brower, 489 U.S. at 599. The majority opinion went on ______ to say:  [A] roadblock is not just a significant show of authority to induce a voluntary stop, but it is designed to produce a stop by physical impact if voluntary compliance does not oc- cur. It may well be that respondents here preferred, and indeed earnestly hoped, that Brower would stop on his own, without strik- ing the barrier, but we do not think it prac- ticable to conduct such an inquiry into sub- jective intent. Nor do we think it possible, in determining whether there has been a sei- zure in a case such as this, to distinguish between a roadblock that is designed to give the oncoming driver the option of a voluntary stop (e.g., one at the end of a straight- ____ away), and a roadblock that is designed pre- cisely to produce a collision (e.g., one ____ located just around a bend). Id. at 598 (citations omitted).  __ Thus, for purposes of determining whether the roadblock in this case worked a Fourth Amendment seizure under Brower, the ______ controlling consideration is not whether it was brightly illumi- nated, located at the end of a long straightaway, or afforded a restrictive avenue of egress.5 Rather, it constituted a Fourth Amendment seizure because Seekamp "was meant to be stopped by the physical obstacle of the roadblock and . . . he was so stopped." Id. at 599.6  __  ____________________ 5The district court found that "[t]he escape route consisted of making a 90-degree turn into a corridor []invisible to oncom- ing traffic." Seekamp, 936 F. Supp. at 28 n.5. Thus, even _______ though the entrance to the invisible corridor was approximately 50 feet wide, it was necessary for McAfee to point it out to approaching vehicles. Id. These findings are not in dispute. ___ 6The dictum in Horta v. Sullivan, 4 F.3d at 15 ("It may be _____ ________ that the illuminated blocking of a single lane at a point some distance from where the block could be seen by the pursued 8 The Brower standard for determining whether a Fourth ______ Amendment seizure has occurred applies whenever "there is a governmental termination of freedom of movement through means intentionally applied." Id. at 597 (emphasis omitted). Thus, __ for example, if the MSP troopers had resorted to some other method, such as the use of spike mats, a Fourth Amendment seizure would have occurred provided Seekamp was "stopped by the very instrumentality set in motion or put in place to achieve that result." Id. at 599. See also Landol-Rivera, 906 F.2d at 796 __ ___ ____ _____________ ("It is intervention directed at a specific individual that furnishes the basis for a Fourth Amendment claim."). B. Did the Roadblock Effect an Unreasonable Seizure? B. Did the Roadblock Effect an Unreasonable Seizure? ________________________________________________ We determine the "reasonableness" of a Fourth Amendment seizure by balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the counter- vailing governmental interests at stake." Graham v. Connor, 490 ______ ______ U.S. 386, 396 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8 _________ ______ (1985)). The Fourth Amendment reasonableness test requires careful attention to the circumstances in the particular case. McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 546 (1st ______ _______________________________ Cir.), cert. denied, 117 S. Ct. 275 (1996). Moreover, "a viable ____ ______ excessive force claim must demonstrate that the police defen-  ____________________ vehicle would not amount to a seizure."), relied on by appellees, not only describes a distinctively different roadblock, but is prefaced by the explicit observation that the court did not need to decide whether "this partial roadblock amounted to a seizure under the Fourth Amendment[,]" id., because defendants were ___ entitled to qualified immunity. Id. at 9, 11-15.  ___ 9 dant['s] actions were not objectively reasonable, viewed in light of the facts and circumstances confronting him and without regard to his underlying intent or motivation." Alexis v. McDonald's ______ __________ Restaurants of Massachusetts, Inc., 67 F.3d 341, 352 (1st Cir. ___________________________________ 1995). See also Graham, 490 U.S. at 397.  ___ ____ ______ Graham identifies three factors for evaluating whether ______ the force used to effect a seizure was objectively reasonable: (1) the severity of the crime, (2) whether there was "an immedi- ate threat to the safety of the officers or others"; and (3) whether the suspect was, inter alia, "actively resisting arrest _____ ____ or attempting to evade arrest by flight." Id. at 396. See __ ___ Alexis, 67 F.3d at 352-53. Under these standards, we conclude ______ that the district court correctly ruled that no rational jury could have found this roadblock unreasonable in the circumstanc- es. See Seekamp, 936 F. Supp. at 28. ___ _______ Seekamp contends that the roadblock was set up in a manner likely to kill him. See Brower, 489 U.S. at 599 (noting ___ ______ that the potential for recovery by Brower arose "only because the unreasonableness . . . allege[d] consist[ed] precisely of setting up the roadblock in such a manner as to be likely to kill him."). In that event, he argues, the more particularized analysis employed in Garner, 471 U.S. at 11, prohibiting deadly force ______ against fleeing suspects who pose no immediate danger to the officers or the public, displaces the Graham analysis. We need ______ only consider the evidence material to the threshold requirement that the roadblock be shown to have been set up in a manner 10 likely to kill Seekamp.  Unlike the "deadman's roadblock" in Brower, 489 U.S. at ______ 594 (unilluminated roadblock hidden beyond sharp curve), the Seekamp roadblock was brightly illuminated and located at the end of a long straightaway. The undisputed evidence established that it was visible from approximately 1500 feet to the north and that the Monte Carlo could have been brought to a complete stop without contacting the roadblock equipment but for its malfunc- tioning brakes. An adequate corridor for circumvention, though not readily apparent to vehicles approaching at excessive speed, had enabled many motorists to bypass the roadblock before Seekamp arrived.7 The Seekamp roadblock thus stands in marked contrast to the "deadman's roadblock" in Brower and the bullet which ______ stopped the fleeing suspect in Garner. Compare Donovan v. City ______ _______ _______ ____ of Milwaukee, 17 F.3d 944, 949-50 (7th Cir. 1994) (differentiat- ____________ ing, based on relative likelihood of death or serious injury, between the nondeadly force employed by ramming a police cruiser into a speeding car and the deadly force employed by driving a cruiser into a speeding motorcycle).  At the time Trooper McAfee established the roadblock, there existed probable cause to believe that Seekamp was a fleeing felon who had eluded local law enforcement officers in Scarborough and Saco and continued to elude the pursuing MSP  ____________________ 7Even though the district court found the roadblock reason- able without regard to the corridor designedly left to permit safe passage for vehicles traveling at slow speed, see Seekamp, ___ _______ 936 F.Supp at 29, its existence, whether or not determinative, is a circumstance material to the reasonableness of the roadblock.  11 troopers, see Me. Rev. Stat. Ann., tit. 29-A, 2501-A (1994) ___ (class C crime to elude officer at reckless speeds resulting in chase); see also Me. Rev. Stat. Ann. tit. 17-A, 1252(2)(C) ___ ____ (1964) (class C crime punishable by five years' imprisonment). Seekamp committed lesser crimes as well, which nonetheless endangered the pursuing officers and the traveling public: driving at 97 m.p.h. in a 65 m.p.h. zone on the Maine Turnpike, see Me. Rev. Stat. Ann. tit. 29-A, 2074(3) (West Supp. 1996) ___ (class E crime to exceed posted speed limit by more than 30 m.p.h.), and driving to endanger by maneuvering to evade the rolling roadblock, see Me. Rev. Stat. Ann. tit. 29-A, 2413 ___ (class E crime) (1964); see also Me. Rev. Stat. Ann. tit. 17-A,  ___ ____ 1252(2)(E) (1964) (class E crimes punishable by six months' imprisonment). Moreover, Seekamp had been evading apprehension throughout the chase. See Graham, 490 U.S. at 396 (evading ___ ______ arrest by flight a factor in determining reasonableness of seizure). Thus, the factors for determining reasonableness under Graham all weighed heavily in favor of employing nondeadly force ______ to contain Seekamp.  Finally, even assuming the information transmitted to Trooper Michaud regarding the identity and condition of the driver of the Monte Carlo was neither stale nor unverifiable, the outcome under Graham would not be altered. Relying on firsthand ______ observation and eyewitness reports from other law enforcement officers engaged in the pursuit, Trooper Michaud had probable cause to believe that a fleeing felon, driving at excessive 12 speeds, had resorted to reckless efforts to evade the rolling roadblock and refused to stop. In these circumstances the information regarding the purported identity and condition of the person driving the Monte Carlo could not have affected the Graham ______ analysis because the officers were faced with a situation which fully warranted a nondeadly roadblock based on the available objective information and the serious danger posed, without regard to the particular influences prompting the driver's dangerous actions. See id. at 396-97.  ___ ___ The Supreme Court has held, in a closely analogous context, that the constitutionality of a seizure based simply on reasonable suspicion does not depend exclusively on whether the police employed the "least intrusive [investigatory] means" available. United States v. Sokolow, 490 U.S. 1, 11 (1989) ("The _____________ _______ reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques."). See also United States v. LaFrance, 879 F.2d 1, 5 ___ ____ _____________ ________ (1st Cir. 1989) (same). As the Court has explained: A creative judge engaged in post hoc evalua- tion of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the pro- tection of the public might have been accom- plished by less intrusive means does not itself render the search unreasonable." The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to rec- ognize or pursue it. United States v. Sharpe, 470 U.S. 675, 686-87 (1985) (citations ______________ ______ omitted) (upholding duration of investigatory stop as reason- 13 able). Moreover, Seekamp proffers no reasonable alterna- tive for resolving the safety threat posed by his persistent, irresponsible conduct. True, the defendant officers never resorted to the alternative Seekamp now proposes: abandoning their pursuit. Implicit in this suggestion, of course, is the premise that fleeing felons must be allowed to proceed on their reckless way without answering for their criminal conduct despite the ongoing risk to the traveling public. The defendant officers recognized that inaction on their part was not a responsible option in the circumstances. We do likewise by acknowledging that their actions in setting up the roadblock and effecting the seizure through nondeadly force were reasonable.8 3. Supervisory Liability 3. Supervisory Liability _____________________ Seekamp contends that MSP Chief Skofield failed to provide the defendant MSP troopers with adequate training and supervision. Supervisory liability under 42 U.S.C. 1983 cannot be predicated on a respondeat superior theory, Hegarty, 53 F.3d __________ ________ _______ at 1379, but "'only on the basis of [the supervisor's] own acts or omissions[,]'" Sanchez v. Alvarado, 101 F.3d 223, 227 (1st _______ ________ Cir. 1996) (quoting Figueroa v. Aponte-Roque, 864 F.2d 947, 953 ________ ____________ (1st Cir. 1989)) (alteration in original). As we pointed out almost a decade ago, a supervisor: can be held liable . . . if (1) the behavior of [his] subordinates results in a constitu- tional violation, and (2) the [supervisor]'s  ____________________ 8Therefore, we need not address the qualified immunity claims. See Horta, 4 F.3d at 9 (bypassing qualified immunity ___ _____ claims in favor of decision on merits). 14 action or inaction was "affirmative[ly] link[ed]" to that behavior in that it could be characterized as "supervisory encourage- ment, condonation or acquiescence" or "gross negligence amounting to deliberate indiffer- ence." Lipsett v. University of Puerto Rico, 864 F.2d 881, 902 (1st Cir. _______ _________________________ 1988) (citations omitted). Moreover, the indifference required to support supervisory liability under section 1983 must be "deliberate, reckless or callous." Gutierrez-Rodriguez v. ___________________ Cartagena, 882 F.2d 553, 562 (1st Cir. 1989). Thus, the "affir- _________ mative link" required between the action or inaction of a super- visor and the behavior of subordinates "contemplates proof that the supervisor's conduct led inexorably to the constitutional violation." Hegarty, 53 F.3d at 1380. _______ The present claim fails at a primitive level, as it meets neither test under Lipsett. First, because the behavior of _______ the subordinate MSP officers was reasonable in the circumstances, see supra pt. II, B, the required predicate a constitutional ___ _____ violation by the subordinate cannot be established. See ___ Lipsett, 864 F.2d at 902. Second, Seekamp adduced no evidence of _______ supervisory indifference to proper police training on the part of defendant Skofield, let alone a level of indifference sufficient to sustain a section 1983 supervisory liability claim. See ___ Sanchez, 101 F.3d at 229 (mere laxity insufficient to establish  _______ 1983 supervisory liability). Quite the contrary, it is undisput- ed that each subordinate defendant received training on high speed pursuit and roadblocks, including a refresher course on MSP high speed pursuit policy, within the year preceding the incident 15 sub judice which itself reflected no inadequate training whatso- ___ ______ ever. III III CONCLUSION CONCLUSION __________ The district court judgment is affirmed.  affirmed ________ 16