# United States Court of Appeals
## For the First Circuit

No. 06-1409

JESÚS MARTINEZ-VÉLEZ; JUAN F. MARTÍNEZ-NIEVES; HARRY J. RIVERA-LUGO; MIGUEL A. VEGA-BARREIRO; RICARDO J. CASTILLO-MONTESINO; JOSÉ R. CASTILLO-MONTESINO; ORLANDO TOLLENS-ORTIZ; EDITH PÉREZ-POSSO; LUIS A. GARCÍA-GONZÁLEZ; SOCORRO AVILÉS-PÉREZ; MARANGELI RIVERA-COLLAZO,

Plaintiffs, Appellees,

JOSÉ A. REYES-CAÑADA; JOSÉ A. RIVERA-TORRES; ROBERTO RAMÍREZ-SANTOS; ISRAEL L. PABÓN-TORRES; IRIS RIVERA-RUIZ,

Plaintiffs,

v.

CÉSAR REY-HERNÁNDEZ, in his official capacity as Secretary of the Puerto Rico Department of Education and in his personal capacity; LIZZETTE PILLICH-OTERO, in her official capacity as Assistant Secretary for Human Resources of the Puerto Rico Department of Education and in her personal capacity; MARÍA CELIA RIVERA, in her official capacity as Assistant Secretary for General Services of the Puerto Rico Department of Education and in her personal capacity; RAFAEL ARAGUNDE,

Defendants,

CARMEN I. MOTTA-MONTAÑEZ, in her official capacity as Director of the Legal Division of the Puerto Rico Department of Education and in her personal capacity; JOSÉ A. RIVERA-SAURÍ, in his official capacity as Transportation Supervisor of the Puerto Rico Department of Education and his personal capacity,

Defendants, Appellants.

_____

No. 06-1410

JESÚS MARTÍNEZ-VÉLEZ; JUAN F. MARTÍNEZ-NIEVES; HARRY J. RIVERA-LUGO; MIGUEL A. VEGA-BARREIRO; RICARDO J. CASTILLO-MONTESINO; JOSÉ R. CASTILLO-MONTESINO; ORLANDO TOLLENS-ORTIZ; EDITH PÉREZ-POSSO; LUIS A. GARCÍA-GONZÁLEZ; SOCORRO AVILÉS-PÉREZ; MARANGELI RIVERA-COLLAZO,

Plaintiffs, Appellees,

JOSÉ A. RIVERA-TORRES; ROBERTO RAMÍREZ-SANTOS; ISRAEL I. PABÓN-TORRES; JOSÉ A. REYES-CAÑADA; IRIS RIVERA-RUIZ,

Plaintiffs,


CÉSAR REY-HERNÁNDEZ, in his official capacity as Secretary of the Puerto Rico Department of Education and in his personal capacity; CARMEN I. MOTTA-MONTAÑEZ, in her official capacity as Director of the Legal Division of the Puerto Rico Department of Education and in her personal capacity; MARÍA CELIA RIVERA, in her official capacity as Assistant Secretary for General Services of the Puerto Rico Department of Education and in her personal capacity; JOSÉ A. RIVERA-SAURÍ, in his official capacity as Transportation Supervisor of the Puerto Rico Department of Education and his personal capacity; RAFAEL ARAGUNDE,

Defendants,

LIZZETTE PILLICH-OTERO, in her official capacity as Assistant Secretary for Human Resources of the Puerto Rico Department of Education and in her personal capacity,

Defendant, Appellant.
_____

No. 06-1411

JESÚS MARTÍNEZ-VÉLEZ; JUAN F. MARTÍNEZ-NIEVES; HARRY J. RIVERA-LUGO; MIGUEL A. VEGA-BARREIRO; RICARDO J. CASTILLO-MONTESINO; ORLANDO TOLLENS-ORTIZ; EDITH PÉREZ-POSSO; LUIS A. GARCÍA-GONZÁLEZ; SOCORRO AVILÉS-PÉREZ; MARANGELI RIVERA-COLLAZO; JOSÉ R. CASTILLO-MONTESINO,

Plaintiffs, Appellees,

JOSÉ A. RIVERA-TORRES; ROBERTO RAMÍREZ-SANTOS; ISRAEL I. PABÓN-TORRES; JOSÉ A. REYES-CAÑADA; IRIS RIVERA-RUIZ,

Plaintiffs,

v.

CÉSAR REY-HERNÁNDEZ, in his official capacity as Secretary of the Puerto Rico Department of Education and in his personal capacity,

Defendant, Appellant,


LIZZETTE PILLICH-OTERO, in her official capacity as Assistant Secretary for Human Resources of the Puerto Rico Department of Education and in her personal capacity; CARMEN I. MOTTA-MONTAÑEZ, in her official capacity as Director of the Legal Division of the Puerto Rico Department of Education and in her personal capacity; MARÍA CELIA RIVERA, in her official capacity as Assistant Secretary for General Services of the Puerto Rico Department of Education and in her personal capacity; JOSÉ A. RIVERA-SAURÍ, in his official capacity as Transportation Supervisor of the Puerto Rico Department of Education and his personal capacity; RAFAEL ARAGUNDE,

Defendants.

_____

No. 06-1412

JESÚS MARTÍNEZ-VÉLEZ; JUAN F. MARTÍNEZ-NIEVES; HARRY J. RIVERA-LUGO; MIGUEL A. VEGA-BARREIRO; JOSÉ R. CASTILLO-MONTESINO; ORLANDO TOLLENS-ORTIZ; LUIS A. GARCÍA-GONZÁLEZ; RICARDO J. CASTILLO-MONTESINO; EDITH PÉREZ-POSSO; SOCORRO AVILÉS-PÉREZ; MARANGELI RIVERA-COLLAZO,

Plaintiffs, Appellees,

JOSÉ A. RIVERA-TORRES; ROBERTO RAMÍREZ-SANTOS; ISRAEL L. PABÓN-TORRES; IRIS RIVERA-RUIZ; JOSÉ A. REYES-CAÑADA,


Plaintiffs,

v.

CÉSAR REY-HERNÁNDEZ, in his official capacity as Secretary of the Puerto Rico Department of Education and in his personal capacity; LIZZETTE PILLICH-OTERO, in her official capacity as Assistant Secretary for Human Resources of the Puerto Rico Department of Education and in her personal capacity; CARMEN I. MOTTA-MONTAÑEZ, in her official capacity as Director of the Legal Division of the Puerto Rico Department of Education and in her personal capacity; MARÍA CELIA RIVERA, in her official capacity as Assistant Secretary for General Services of the Puerto Rico Department of

Education and in her personal capacity; JOSÉ A. RIVERA-SAURÍ, in his official capacity as Transportation Supervisor of the Puerto Rico Department of Education and his personal capacity,

Defendants,

RAFAEL ARAGUNDE; SECRETARY OF EDUCATION,

Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Gustavo A. Gelpí, U.S. District  Judge]

_____

Before

Boudin, Chief Judge,

Selya, Senior Circuit Judge,

and Howard, Circuit Judge.

_____

Edward W. Hill-Tollinche with whom Quiñones & Sánchez, P.S.C. was on brief for Lizzette Pillich-Otero.
Luis A. Rodríguez-Muñoz with whom Roberto Sánchez-Ramos, Secretary of Justice, Salvador Antonetti-Stutts, Solicitor General, Eileen Landrón-Guardiola, Eduardo Vera-Ramírez and Landrón & Vera, LLP were on brief for César Rey-Hernández, Carmen I. Motta-Montañez and José A. Rivera-Saurí.
Zulema E. Martínez-Alvarez with whom Salvador J. Antonetti-Stutts, Solicitor General, Mariana D. Negrón-Vargas, Deputy Solicitor General, and Maite D. Oronoz-Rodríguez, Deputy Solicitor General, were on brief for Rafael Aragunde, in his official capacity as Secretary of Education.
Michael Craig McCall with whom Eliezer Aldarondo-Ortiz, Iván Castro-Ortiz, Sheila Torres-Delgado and Aldarondo & López Bras were on brief for plaintiffs, appellees.

_____

October 23, 2007

_____

**BOUDIN, <u>Chief Judge</u>**.  On November 7, 2000, Puerto Rico's incumbent New Progressive Party ("NPP") was defeated by its primary opponent, the Popular Democratic Party ("PDP"), in the gubernatorial election.  The governor-elect chose Cesar Rey-Hernandez to serve as Secretary of Education in the new administration, and Rey took office on January 8, 2001.  Events, mostly occurring after Rey took office, led certain employees of the department to file section 1983 claims, 42 U.S.C. § 1983 (2000), in the federal district court for Puerto Rico.

The suit was filed against Rey and others by a group of drivers (and two of their spouses[1]), by a probationary attorney (Edith Perez-Posso) and by Luis Garcia-Gonzalez, an investigator who had served the secretary in the previous administration.  Each plaintiff claimed to have suffered injury resulting from political discrimination in violation of the first amendment and subject to redress under section 1983.  <u>Rutan</u> v. <u>Republican Party of Ill.</u>, 497 U.S. 62, 74-76 (1990).

The case was tried twice.  On the first attempt, in May and June 2004, the jury deadlocked and a mistrial was declared.  In a retrial in October and November 2005, the jury returned a verdict largely in the plaintiffs' favor on November 23, 2005.  Because the

---

[1]The spouses filed pendent claims under articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141-42. These judgments stand or fall with the drivers' section 1983 claims and need no separate discussion.

-5-

case embraced four different "mini trials" with different parties and different episodes, we do no more here than summarize the verdicts as modified after post-trial motions.

>    1.    Seven drivers obtained verdicts against Rey and Lizzette Pillich-Otero, who was Rey's Assistant Secretary for Human Resources, based on the drivers' transfer to a central transportation pool and loss of overtime pay.  The awards ranged from $1 to $25,000 in compensatory damages with nominal awards for punitive damages.

>    2.    The same seven drivers prevailed against Jose Rivera-Sauri, the supervisor of the office to which they were transferred, for alleged acts of harassment.  Sauri was held liable with Rey and Pillich with no allocation of damages as between transfer and harassment claims.

>    3.    Edith Perez-Posso, who worked as a probationary attorney in the legal division of the department, was awarded $11,000 plus nominal punitive damages against Carmen Motta-Montanez, the new director of the division who had evaluated and terminated Perez-Posso.

>    4.    Luis Garcia-Gonzalez was awarded $10,000 in compensatory damages against Rey and Motta and a further $10,000 in punitive damages against Motta.  Garcia had accused both of fostering administrative charges against him that led to temporary suspension and delayed his intended retirement.

The district court also granted equitable relief in light of the jury's findings.  Specifically, the court ordered that a plan be adopted to ensure that overtime work not be distributed to career drivers based on political affiliation; that Perez be reinstated; and that an admonishment be expunged from Garcia's

employment file.  Plaintiffs' counsel were awarded attorneys' fees in the amount of $ 949,631.40.

All four defendants (Rey, Motta, Pillich and Sauri) now appeal, contesting the money judgments against them and the award of attorneys' fees.  The current education secretary, who has succeeded Rey, seeks review only of the attorneys' fees awarded against the secretary in his official capacity.  No one has sought to overturn the equitable relief.  Before examining the four different episodes one by one, we begin with the common legal framework.

The Supreme Court, in a set of decisions beginning with Elrod v. Burns, 427 U.S. 347 (1976), has declared it to be a violation of the first amendment for government officials to take adverse actions--at least of a certain level of severity and with certain exceptions--against other government employees based on their political party affiliation.[2]  The rationale is to avoid chilling the employees' rights of political free speech and association.  Rutan, 497 U.S. at 73.

Inevitably, the case law recognizes that political affiliation is a legitimate touchstone for policy-makers or those who serve in a confidential capacity.  Elrod, 427 U.S. at 367-68. (Often, but not always, this category overlaps with those not

---

[2]Elrod, 427 U.S. at 373 (patronage dismissals); Branti v. Finkel, 445 U.S. 507, 519-20 (1980) (same); Rutan, 497 U.S. at 65 (promotion, transfer, recall, and hiring decisions).

protected by civil service laws, called "trust" employees in Puerto Rico.)  Nor does liability attach where an adverse employment action, even though resting in part on political motives, would have been taken anyway for permissible reasons (e.g., misconduct or incompetence).  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285-87 (1977).

A prima facie case requires evidence that "(1) the plaintiff and the defendant belong to opposing political affiliations; (2) the defendant has knowledge of the plaintiff's . . . affiliation; (3) . . . a challenged employment action [occurred]; and (4) . . . 'political affiliation was a substantial or motivating factor'" behind it.  Pequero-Moronta v. Santiago, 464 F.3d 29, 48 (1st Cir. 2006) (quoting Gonzalez-de-Blasini v. Family Dept., 377 F.3d 81, 85-86 (1st Cir. 2004)).  A defendant may contest this showing, offer a Mt. Healthy defense or both.

The usual vehicle for such claims against state actors is section 1983, whose remedy embraces actual and (sometimes) punitive damages, as well as attorneys' fees.[3]  Because of the eleventh amendment, the damages claims are usually brought against individual government officials in their personal capacities while

---

[3]Carey v. Piphus, 435 U.S. 247, 255-57 (1978) (ordinary principles of compensation apply); Smith v. Wade, 461 U.S. 30, 55-56 (1983) (punitive damages available against individual officers if their conduct was motivated by evil intent or involved reckless or callous indifference to constitutional rights); see also 42 U.S.C. § 1988(b) (attorneys' fees).  But see City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981) (municipal governments cannot be liable for punitive damages).

equitable relief runs against officers in their official capacities (<u>i.e.</u>, effectively against the state entity itself). <u>Will</u> v. <u>Mich. Dep't of State Police</u>, 491 U.S. 58, 66 (1989); <u>Quern</u> v. <u>Jordan</u>, 440 U.S. 332, 337 (1979).

Where the sufficiency of the evidence is contested, the question is whether, drawing reasonable inferences and resolving credibility in favor of the prevailing party, a rational jury could have found in favor of the plaintiff. <u>Bisbal-Ramos</u> v. <u>City of Mayaguez</u>, 467 F.3d 16, 22 (1st Cir. 2006). Other issues, such as jury instructions or evidentiary rulings, are judged on appeal by the standards applicable to the issue. <u>E.g.</u>, <u>Diaz-Rivera</u> v. <u>Rivera-Rodriguez</u>, 377 F.3d 119, 123 (1st Cir. 2004) (evidentiary issues).

<u>Driver claims against Rey and Pillich</u>. Prior to December 2000, all seven driver-plaintiffs worked at the Office of the Secretary, on the twelfth floor of the main Department of Education building in San Juan. All were affiliated with the NPP. Primarily, they drove department officials, but in practice, their work included many other duties--everything from messenger service to answering the phones--and each of them performed a substantial amount of overtime work, in some cases almost doubling their base salaries.

When Rey took office in January 2001, two of the seven drivers had transferred to another facility[4] but the other five testified that they then received less work and that several PDP members appeared on the twelfth floor and were doing some of the duties that the seven had earlier done. In February 2001 Rey approved a plan whereby drivers, whether assigned to the twelfth floor or not, were re-assigned to a general pool--ultimately comprising some 25 drivers--centrally supervised in an annex to the main building.

The seven drivers were reassigned to this pool effective February 20, 2001. In the subsequent weeks, several more PDP drivers were assigned work on the twelfth floor and thereafter enjoyed substantial overtime. Various officials on the twelfth floor often sought assignment of particular drivers who were PDP members and the overtime flowed to these drivers. None of the seven driver-plaintiffs thereafter enjoyed substantial overtime.

The drivers' theory at trial was that the sequence of events just described added up to a plan, for which Rey and Pillich were responsible, to displace the NPP drivers on the twelfth floor (and the two brothers who had transferred to Naranjito) with PDP drivers who would thereafter enjoy the overtime, and that the motive was political discrimination against the former and in favor

[4]In December 2000, for personal reasons two of the driver-plaintiffs, brothers Jose and Ricardo Castillo, requested a transfer to a department facility in Naranjito, which is located about an hour from San Juan.

-10-

of the latter. Rey and Pillich say that the evidence for such a determination was lacking.

The jury could have concluded that overtime did shift from the five drivers who initially remained on the twelfth floor to PDP drivers and that the two brothers who had transferred (see note 4, above) were seriously inconvenienced by their re-transfer to the pool, impairing their ability to keep non-government evening jobs. That there was no entitlement to overtime or to a particular location is no barrier under the precedents and their rationale. Rutan, 497 U.S. at 72.

Probably the jury was also entitled to conclude that the NPP affiliation of the seven was sufficiently well known that Rey and Pillich were aware of it, cf. Pequero-Moronta, 464 F.3d at 48; perhaps, also, that after the transfer the defendants were aware that overtime previously available to the NPP drivers now went to PDP drivers. No one disputes that the pool plan was approved by Rey and the transfers (pursuant to the plan) of all seven driver-plaintiffs were signed by Pillich.

But fatally, there is no evidence that Rey or Pillich conceived the pool plan or transfers as a means of favoring PDP drivers over NPP drivers or that they approved or fostered the re-direction of twelfth floor work or overtime to PDP drivers. The pool arrangements merely centralized supervision of the drivers. So far as the record reveals, the PDP drivers achieved such

-11-

benefits almost entirely as a result of decisions by various other twelfth floor officials who, on an individual basis, requested particular drivers generally or for specific assignments.

On this record, Rey and Pillich cannot be held liable for discrimination by others. Section 1983 does not impose purely supervisory liability, Rizzo v. Goode, 423 U.S. 362, 375-77 (1976); it aims at "persons who have actually abused their positions of authority," Dunham v. Crosby, 435 F.2d 1177, 1180 (1st Cir. 1970), and hence "only persons who were directly involved in the wrongdoing may be held liable." Kostka v. Hogg, 560 F.2d 37, 39 (1st Cir. 1977). Exceptions exist but are either irrelevant here or have not been invoked.[5]

True enough, a couple of PDP members showed up on the twelfth floor early in the new administration to do some of the work done by the NPP drivers; but there was no proof as to who had assigned them (or that they earned overtime pay). Three more appeared after the February transfer, but again there is no proof who sought them. Plaintiffs at trial pointed to two more PDP drivers, but one was clearly requested by the Office of

---

[5]Officers can be held liable for the acts of their subordinates if they engaged in "'supervisory encouragement, condonation or acquiescence' or 'gross negligence amounting to deliberate indifference,'" Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 902 (1st Cir. 1988) (citation omitted), but that is a demanding standard, see Seekamp v. Michaud, 109 F.3d 802, 808 (1st Cir. 1997). Municipalities, but not states, can be held liable for acts of municipal employees only if those actions constitute a "policy or custom" of the government. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

Communications, and another appears to have worked in San German, not in San Juan.

Pillich in an administrative capacity signed off for overtime earned by various PDP drivers on the twelfth floor but there is no indication that she chose the drivers. Indeed, in some cases the officials who actually ordered the overtime were Pillich's superiors in the department. The sign-offs suggest that Pillich knew that PDP drivers were doing well at the expense of NPP drivers but not that she caused them to be so favored.

On its face, the pool plan was a plausible piece of agency reorganization, centralizing some 25 or so drivers including both NPP and PDP members under one office. If Rey or Pillich had instigated or approved the subsequent favoring of PDP members, it might be inferred that they had conceived the plan for this purpose. But there was no such evidence. The officials who systematically summoned PDP drivers for overtime might perhaps have been sued but they were not.

The drivers did show, and the jury was free to believe, that defendants were committed political partisans. More pertinent to a discrimination claim, Pillich (but not Rey) was accused of uttering two arguably hostile political remarks and the jury may have credited the testimony (although the remarks were pretty mild by current standards).[6] But this hardly shows that either Rey or

_____

[6]One of Pillich's two remarks dated back to 1996, and the other--that Pillich warned a colleague not to trust one of the

Pillich devised the pool plan to mask a discriminatory scheme to be executed by others.

Contrast this with Fernandez v. Chardon, 681 F.2d 42 (1st Cir. 1982), which also concerned a facially neutral policy promulgated by a then-Secretary of Education. Although the policy had the ultimate result of demoting employees of one party in favor of those belonging to the other, the "critical evidence" against the then-secretary, id. at 56, comprised his comments that his party would ensure that its political opponents would not fill any vacancies.

If the reorganization in this case was hatched as a plan to clear the decks of NPP drivers so that PDP drivers could be favored, it was up to plaintiffs to conduct the necessary discovery and offer the evidence. Liability without such proof would effectively preclude any post-election reorganization that happens to affect adversely employees connected to the previously dominant party. Cf. Marin-Piazza v. Aponte-Roque, 873 F.2d 432, 434 (1st Cir. 1989). The verdicts for the drivers (and for the spouses) cannot stand as against Rey and Pillich.

Driver claims against Sauri. The claim of the seven drivers against Sauri is this: that after their transfer to his pool he harassed them because of their political affiliation--

_____

drivers because he was a remnant of the former administration--is not particularly probative of anything beyond her knowledge of his political affiliation.

-14-

specifically, by subjecting them but not PDP drivers to humiliating roll calls, by following them to the cafeteria on their breaks, by selectively blaming them when things went amiss, by falsely altering their time sheets and by forcing them to sit inside an office that was too small.

Actions of informal harassment, as opposed to formal employment actions like transfers or demotions, can be the basis for first amendment claims if the motive was political discrimination; but this is so only if the discriminatory acts are "sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party." Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1217 (1st Cir. 1989) (en banc).

This threshold is implicit in the rationale for granting Rutan protection--to safeguard political speech and association-- and distinguishes "the wheat" of real impairments from "the chaff of minor irritants and frustrations" in any workplace. Agosto-de-Feliciano, 889 F.2d at 1214. An ambiguous footnote in Rutan, 497 U.S. at 76 n.8, could imply that even withholding of a birthday party might be enough; but Rutan's text does not so suggest and our cases have "continued to apply the Agosto-de-Feliciano standard," Bisbal-Ramos, 467 F.3d at 22.[7]

_____

[7]Miranda Otero v. P.R. Indus. Comm'n, 441 F.3d 18, 22 n.4 (1st Cir. 2006); Rosario-Urdaz v. Velazco, 433 F.3d 174, 178 n.3 (1st Cir. 2006); Gonzalez-Pina v. Rodriquez, 407 F.3d 425, 431 n.2 (1st Cir. 2005); Ortiz Garcia v. Fernandez, 405 F.3d 21, 23 n.4 (1st

-15-

If everything alleged by the drivers was supported by the record, we would agree such actions could, taken together, be deemed by a jury sufficiently weighty to discourage political affiliation or speech; and then, if improper motivation were expressed or reasonably inferred, a first amendment claim would be made out--although it is puzzling how such harassment could have caused substantial economic damages unless altering the time sheets caused a loss of pay (for which no proof was offered).

But the drivers' case substantially weakens as one examines the evidence. There was no proof that Sauri ordered selective roll calls; they were conducted by a secretary and ceased within days after complaints were made. The alleged casting of blame by Sauri concerns one offhand, isolated, sarcastic comment by Sauri that the Castillo brothers would know the location of a missing key; the drivers also testified that Sauri tended to suspect them whenever a car broke down, but no specific incidents were described.

The room assigned to the drivers waiting for tasks may well have been too small but it was shared by all drivers, PDP and NPP alike. The district judge found no evidence to suggest that

Cir. 2005); Acosta-Orozco v. Rodriguez-de-Rivera, 132 F.3d 97, 101 n.5 (1st Cir. 1997); accord Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ., 232 F.3d 1334, 1340 n.2 (10th Cir. 2000); Pierce v. Tex. Dep't of Criminal Justice, 37 F.3d 1146, 1149 n.1 (5th Cir. 1994), cert. denied, 514 U.S. 1107 (1995). But see Tao v. Freeh, 27 F.3d 635, 639 (D.C. Cir. 1994); Rodriguez-Pinto v. Tirado-Delgado, 982 F.2d 34, 42 (1st Cir. 1993) (Torruella, J., concurring).

-16-

Sauri discriminated with respect to the allocation of duties. As for following the drivers to the cafeteria, Sauri agrees that he did so on occasion because he was concerned that the seven drivers, or at least some of them, were abusing their breaks. None of this adds up to culpable harassment by Sauri.

Turning to the time sheets, false alterations for improper purposes would be close to fraud, and the economic consequences for the drivers could be serious. But Sauri apparently reviewed time sheets as part of his job and made adjustments both for and against the seven drivers; the evidence is very muddled but we are given no basis to infer that his changes were deliberately false or formed a suspicious pattern.

Wrongdoing might perhaps have been inferred if the driver-plaintiffs had shown that the changes adversely affected their pay or tenure. But it appears from the record that the drivers had fixed salaries for their basic work and that Sauri confirmed on the time sheets that they had satisfied all their work requirements. The drivers countered with only the vague and undetailed suggestion that somehow their benefits might have been affected. This is hardly enough.

Unlike the verdict against Rey and Pillich, the verdict against Sauri has no single glaring flaw, and we are reluctant to second guess a jury on a confusing record. But even resolving doubts in favor of the plaintiffs, what remains--after the hopeless

allegations are stripped away--is just too thin to support a finding of liability. Allowing a judgment to rest on this collection of complaints would "trivialize the First Amendment." Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982).

Perez' claim against Motta. Perez' claim is by far the most straightforward discrimination claim presented. Perez, then serving as a probationary employee doing legal work, says that Motta, the new department head and a PDP supporter, gave Perez a failing evaluation because of Perez' affiliation with the NPP. On appeal, Motta says that the evidence was insufficient. We think that the case is close but that the jury was within bounds in imposing liability.

Perez testified that she had been given a favorable evaluation prior to the PDP election, that Motta took over the legal department in January 2001, and that Perez received no work for about two weeks thereafter. Then she got a batch of contracts to review, which took about three days, and thereafter got no new assignments until February 27, when Motta gave her a new evaluation ranking her unsatisfactory. In consequence, Perez lost her position.

Perez also claimed that she had sought repeatedly to contact Motta during the intervening weeks, first by leaving messages with her secretary and later by slipping a memo under Motta's office door. Perez said that her evaluation meeting with

-18-

Motta lasted only five minutes, while her prior evaluation meeting lasted over an hour. Perez also alleged that Motta had made two politically charged remarks (during a single incident) prior to the general election.

Motta responded by giving detailed reasons for the evaluation: that Perez erroneously cited statutes, did not accept constructive criticism, was frequently absent from the office without explanation, and did not fulfill tasks that she was asked to perform. Motta denied making the hostile remarks attributed to her, claimed she did meet with Perez, and explained that Perez received work not from Motta but whenever contracts to review were forwarded by others.

On appeal, Motta argues that there was no direct evidence that she was even aware of Perez' party affiliation, but based on Perez' testimony that she spoke openly about her political views and sat in the NPP portion of the de facto segregated cafeteria, a reasonable jury could infer that Motta, who worked alongside Perez for about six months, was aware of Perez' affiliation. See Peguero-Moronta, 464 F.3d at 48.

The evidence that Motta gave an unduly low recommendation for political reasons is more debatable. We must assume that Motta made the two remarks that Perez reported.[8] Worse still for Motta,

_____

[8]The first of these--that if someone put a bomb in the Department of Education, half of the NPP electorate would disappear --is not highly probative of likely discrimination; the second-- that if the PDP were successful in the elections then Motta would

-19-

stronger motive evidence as to Motta's involvement with Garcia (which we discuss next) resulted not only in liability but also substantial punitive damages against Motta.  The jury was free to draw inferences from this episode as well--including the particularly damaging testimony by Garcia that Motta indicated her intent to "fire all the NPPs" in the office.

That Perez was given a favorable evaluation immediately before the change in administration also could raise doubts about the fairness of Motta's evaluation and therefore its motive, although this inference is tempered by the circumstances: in particular, Perez' positive evaluation was rendered under the NPP regime on December 31, 2000, which was a Sunday, New Year's Eve, and only a few days before Rey began his term.  Still, the jury could have found that the earlier evaluation was not a white-wash.

The most troubling concern about the verdict is that Motta's explanation for her evaluation is coherent and much of it not directly contradicted.  But the jury was not obliged to credit Motta's good faith or veracity.  In addition to Perez' prior favorable evaluation and the damaging motive evidence against Motta, the two contradicted each other directly as to whether Motta had made the two remarks and whether she had evaded Perez; and the jury may have been doubtful about Motta's explanation for Perez' prolonged idleness since Motta headed the office.

---

be "chopping heads down"--is more telling in relation to what happened to Perez.

Thus, unlike the case of the drivers against Sauri, this claim was about a concrete job loss and the dispute here was largely about whom to believe. Here our deference to the jury is at its zenith: they are closer to the gritty detail and see and hear the witnesses. Rodriguez-Marin v. Rivera-Gonzalez, 438 F.3d 72, 75 (1st Cir. 2006). Neither story was implausible nor clearly confirmed (or negated) by objective evidence, and so the jury's judgment as to who told the truth must stand.

Garcia's claim against Rey and Motta. Garcia's claim is that Rey and Motta fostered administrative charges against him because of Garcia's political support of the NPP. Garcia held a trust position and, when the new administration took over, Rey notified Garcia that he would be returned to his career position as an administrative complaints investigator. Trust positions are often unprotected under Rutan; anyway, Garcia does not now challenge his re-assignment.

Rather, at trial in the district court, Garcia testified that on the day he received the letter from Rey removing him from his trust position, he encountered Motta--whom he had long known--who said that she was going to fire all the NPP supporters and that she was going to fire him "and take you off your motor bike so you won't do any more politics." Garcia said that Motta repeated the threat later that day. Thereafter, Garcia tendered his resignation to Motta. In response, Garcia received a letter on February 13,

2001, from Rey saying that Garcia could not resign because of a pending harassment complaint filed against him by another employee. A previous Secretary of Education had found "no cause" to discipline Garcia for "sexual harassment" but it is unclear whether the earlier complaint remained pending on other charges (specifically, labor harassment). Later Rey notified Garcia that he intended to pursue the charges.

Thereafter, Rey signed a letter adding an additional charge of insubordination, and Garcia was suspended with pay pending a final disciplinary decision. Both of the two "intent" letters appear to have been typed by one of Motta's secretaries. After a hearing before an examiner, who concluded that some but not all of the charges had basis in fact, Garcia was terminated on July 16, 2002.

After Garcia brought his federal claim, the charges were settled within the administrative process on terms largely (although not wholly) favorable to Garcia: Garcia accepted a reprimand on one of the charges, was allowed to resign, and received full pay for the period between his termination and ultimate resignation. As part of the settlement, Garcia agreed not to seek reinstatement or back pay in federal court but otherwise reserved his federal claim:

> The agreements contained in this document do
> not constitute a waiver of the claim filed by
> the Appellant before the Federal District
> Court of San Juan, Puerto Rico, except that

> which regards the compensation for the wages not received, as stated previously, and the reinstatement to the position from which he resigned, however, it does constitute a waiver of any other cause of action that the Appellant may have against the Agency, its officers or employees in their official capacity.

On this appeal, remarkably Rey and Motta first challenge the verdict against them on the ground that the claim is barred by res judicata. The res judicata argument rests on the assertion that the settlement waiver provision block-quoted above disposed of the present claim against Rey and Motta. Res judicata is a doubtful label for the issue,[9] but the label does not matter; the question is the scope of the waiver provision.

The quoted language in the agreement makes clear that Garcia's federal court claim against Rey and Motta in their personal capacities was neither settled nor waived. We find hard to understand, and impossible to accept, defendants' argument that the agreement only purports to preserve claims unrelated to the administrative charges. It reserves "the claim" filed by Garcia in federal court and, although he offered multiple theories, the

---

[9]Whether and when res judicata operates in administrative proceedings is complicated; so, too, the question when a settlement of administrative proceeding has res judicata effect. E.g., Diaz-Seijo v. Fajardo-Velez, 397 F.3d 53, 55-56 (1st Cir. 2005); DeSario v. Thomas, 139 F.3d 80, 87 n.4 (2d Cir. 1998), vacated on other grounds sub nom., Slekis v. Thomas, 525 U.S. 1098 (1999); see also Univ. of Tenn. v. Elliott, 478 U.S. 788, 799 (1986). See generally 18B Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction 2d § 4471.3 (2002).

-23-

misuse of the administrative proceedings was encompassed by his federal complaint.

This argument is followed in the defendants' brief by four paragraphs which mingle what might be a defense on the merits if it had been developed--"Garcia failed to present evidence that the actions of Rey or Motta were not reasonable with regards to the initiation of the administrative proceedings nor did political animus exist[]."--with assertions that "they are both entitled to qualified immunity."

In order to challenge the sufficiency of the evidence, the defendants would need to identify the weak elements in Garcia's case, substantially develop the record evidence on the key issues, provide relevant background and offer a serious analysis of the inferences that the jury might or might not reasonably have drawn. Virtually none of this is furnished in the brief--indeed, the four paragraphs are primarily directed to urging qualified immunity--a claim to which we will return.

The failure to make a serious sufficiency argument may have been a mistake--at least as to Rey. That Rey formally caused the charges against Garcia is patent; but, of course, he _may_ merely have followed procedures and taken advice from lawyers instead of acting from an improper motive. Nor did he make inflammatory threats from which a discriminatory intent could readily be

inferred.  Garcia's evidence of Rey's animus (e.g., that Rey appointed PDP partisans) is unimpressive.

The case against Motta is stronger but not airtight. Garcia testified about her threats (the award of punitive damages suggests this was believed).  But all that links her directly to Garcia's travails are her secretary's initials on Rey's letters and Motta disclaimed involvement.  Yet the jury may not have believed her and, given her position and legal training, it might be inferred that she was Rey's natural advisor on whether charges should be brought.

But the defendants' failure to develop the sufficiency issue on appeal and supply the necessary information is a fatal forfeiture.  Mass. Sch. of Law v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998).  Because of this, we cannot be sure that our own initial hesitation has fairly captured the evidence on both sides. In addition, the failure seriously to brief the sufficiency issue meant that Garcia was handicapped in his efforts to respond although he did make more of an effort than the defendants' brief on this issue deserved.

Defendants' four paragraphs do more clearly make a different and simpler argument, namely, that qualified immunity protects them, whatever their subjective motives, because a "reasonable" official would have thought that there was a basis for the charges.  Even here, background information is not supplied,

but in all events in political discrimination cases--where wrongful motive is an <u>element</u> of the claim--the case law has regularly rejected this objective-reasonableness argument.[10]

Rey also disputes two of the district court's rulings admitting evidence that Rey wanted excluded under Federal Rule of Evidence 403. That rule requires district judges to weigh the probative value of the challenged evidence against the unfair prejudice that would result if it were admitted. We review the district judge's evidentiary rulings under Rule 403 for abuse of discretion. <u>United States</u> v. <u>Bradshaw</u>, 281 F.3d 278, 284 (1st Cir. 2002).

At trial, Rey testified that beyond casting his vote for the PDP, he had no connection to the party or to partisan activities. He claimed not to be aware of the political affiliations of the plaintiffs, including Garcia--whom he removed from his trust position and reinstated as a career employee. On cross examination, plaintiffs' counsel was permitted to question Rey about the trust officials he had appointed upon taking office; of course, they were revealed to be PDP supporters, although Rey denied knowing their affiliations.

On appeal, Rey argues that because he was legally entitled to prefer PDP members when selecting these senior policy-

---

[10]<u>Rivera-Torres</u> v. <u>Ortiz Velez</u>, 341 F.3d 86, 96-97 (1st Cir. 2003), <u>cert. denied</u>, 541 U.S. 972 (2004); <u>Feliciano-Angulo</u> v. <u>Rivera-Cruz</u>, 858 F.2d 40, 45-47 (1st Cir. 1988). <u>But see</u> <u>Crawford-El</u> v. <u>Britton</u>, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting).

making officials, allowing that line of questioning was error. But Rey also claimed that he was entirely independent of party politics, and the questions were quite relevant in impeaching Rey as to his own (seemingly unnecessary) defense. In short, the questions went directly to Rey's own characterization of his relationship to partisan politics.

This is also true of evidence that Garcia adduced from Pillich, who was called as a hostile witness. Pillich was questioned about a paragraph in her affidavit in another case that elaborated on her knowledge of Rey's participation and involvement in PDP partisan activities. Rey says that Pillich's allegations in the prior case were not "resolved or adjudicated"; but it was for the jury to evaluate whether Pillich's testimony should be believed.

Attorneys' Fees. Because attorneys' fees depend in large part on which parties won the case and the extent of their victory, see Hensley v. Eckerhart, 461 U.S. 424, 434-37 (1983), they will now have to be recalculated, but we address now two concerns raised by defendants that are unlikely to disappear on remand.

Part of the fees calculation is the selection of an appropriate hourly rate for each attorney. Rates should be "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). Defendants argue that the

hourly rates accepted by the district judge were excessive under that standard. But we review fee awards only for "manifest abuse of discretion." Diaz-Rivera v. Rivera-Rodriguez, 377 F.3d 119, 124 (1st Cir. 2004).

The order granting attorneys' fees cites precisely the factors that the Supreme Court has deemed relevant. Defendants point to prior cases that have authorized lower rates, but each case is unique and rates inflate over time; indeed, the district court reduced the total award by two percent because much work had occurred in earlier years. The rates in this case do not fall outside the trial court's "extremely broad" discretion. Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992).

Defendants also argue that the documentation provided by plaintiffs' counsel was not contemporaneous. Counsel never claimed it was; the exhibit to their motion said it was "prepared from contemporaneous time records," adjusted to filter out work done for unsuccessful plaintiffs or on unsuccessful claims. If defendants suspected tampering or inaccuracy, they should have sought discovery. Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 297 (1st Cir. 2001).

The judgments in favor of the drivers (and spouses) are reversed; those in favor of Perez and Garcia are affirmed. The award of counsel fees is vacated and remanded for reconsideration

in light of the reversal of the judgments as to the drivers.  All parties will bear their own costs and attorneys' fees on appeal.

It is so ordered.